In the
United States Court of Appeals
For the Seventh Circuit

No. 01-3304

Ty, Inc.,

Plaintiff-Appellee,

v.

Publications International Ltd.,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 5565--James B. Zagel, Judge.

Argued April 5, 2002--Decided May 30, 2002


   Before Flaum, Chief Judge, and Posner and
Rovner, Circuit Judges.

   Posner, Circuit Judge.  Ty is the
manufacturer of Beanie Babies. These
well-known beanbag stuffed animals are
copyrightable as "sculptural works," 17
U.S.C. sec.sec. 101, 102(a)(5); Ty, Inc.
v. GMA Accessories, Inc., 132 F.3d 1167,
1169 (7th Cir. 1997), and are copyrighted
by Ty, which brought this suit for
copyright and trademark infringement
against Publications International, Ltd.
(PIL), publisher of a series of books,
with titles such as For the Love of
Beanie Babies and Beanie Babies
Collector's Guide, that contain
photographs of Beanie Babies. PIL
concedes that photographs of Beanie
Babies are derivative works, which, being
copies of copyrighted works, can be
produced only under license from Ty--and
PIL has no license. PIL's defense to the
charge of copyright infringement is the
doctrine of fair use. On Ty's motion for
summary judgment, the district court
rejected the defense, granted the motion,
and issued a permanent injunction against
PIL's selling any of its Beanie Babies
books. It also awarded Ty PIL's profits
from the sale of those books, $1.36
million, plus more than $200,000 in
prejudgment interest.

   The trademark claim remains in the
district court, which denied summary
judgment on that claim, but the court en

tered final judgment on the copyright claim under Fed. R. Civ. P. 54(b) to permit an immediate appeal. However, Rule 54(b) authorizes the district court to enter a final judgment on a separate claim only if that claim is separate from the claim or claims remaining for decision in the district court--separate not in the sense of arising under a different statute or legal doctrine, such as the trademark statute versus the copyright statute, but in the sense of involving different facts. Continental Casualty Co. v. Anderson Excavating & Wrecking Co., 189 F.3d 512, 516 (7th Cir. 1999); Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1162-63 (7th Cir. 1997); NAACP v. American Family Mutual Ins. Co., 978 F.2d 287, 292 (7th Cir. 1992); see Curtiss-Wright Corp. v. General Electric Co., 446 U.S. 1, 8 (1980); Advanced Magnetics, Inc. v. Bayfront Partners, Inc., 106 F.3d 11, 21-22 (2d Cir. 1997); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 580 (1st Cir. 1994). Otherwise the appellate court would have to go over the same ground when the judgment terminating the entire case was appealed.

At first glance the factual overlap might seem complete in this case, since the identical images, PIL's photographs of Beanie Babies, are claimed to infringe both Ty's copyrights and its trademarks. But the only facts before us on this appeal, the facts bearing on PIL's defense of fair use, are unlikely to be at issue in the trademark phase of the case. Moreover, although the district court issued a permanent rather than a preliminary injunction, that injunction is appealable immediately, irrespective of Rule 54(b), by virtue of the provision of the Judicial Code that permits "interlocutory orders . . . granting . . . injunctions" to be appealed. 28 U.S.C. sec. 1292(a)(1). Although this provision is ordinarily used to permit the immediate appeal of preliminary (temporary) injunctions, it is not so limited as a matter either of statutory language or statutory purpose. United States v. Hansen, 795 F.2d 35, 38 (7th Cir. 1986); Prohosky v. Prudential Ins. Co., 767 F.2d 387, 391 n. 4 (7th Cir. 1985); Parks v. Pavkovic, 753 F.2d 1397, 1402-03 (7th Cir. 1985); Fielder v. Credit Acceptance Corp., 188 F.3d 1031, 1033 (8th Cir. 1999); Warren Publishing,

Inc. v. Microdos Data Corp., 115 F.3d 1509, 1511 and n. 1 (11th Cir. 1997) (en banc); 16 Charles Alan Wright et al., Federal Practice & Procedure, sec. 3924, pp. 149-53 (2d ed. 1996). An order is interlocutory when it does not wind up the litigation in the court issuing the order, and that is the character of the permanent injunction that the district court issued in this case. And while one reason for permitting the immediate appeal of a preliminary injunction is that such an injunction is entered after a summary proceeding, increasing the risk of error, that turns out to be the character of the permanent injunction in this case as well: it was issued in response to a motion for summary judgment, and not after a trial.

   The main reason for allowing the interlocutory appeal of an injunction, moreover, is that an injunction is likely to inflict irreparable harm on the defendant, that is, harm that a reversal will not cure. The harm will be prolonged and thus increased if the defendant must await the completion of further proceedings in the district court before challenging the injunction in the court of appeals. This is true whether the injunction is permanent or temporary--in fact it is truer for the former. The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him, and so it is required only for a temporary restraining order or a preliminary injunction, Fed. R. Civ. P. 65(c), not for a permanent injunction.
   So we have jurisdiction by virtue both of Rule 54(b) and section 1292(a)(1), and thus can proceed to the merits, where the only question is whether PIL is entitled to a trial on its defense of fair use. "Fair use is a mixed question of law and fact," Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 560 (1985), which means that it "may be resolved on summary judgment if a reasonable trier of fact could reach only one conclusion"--but not otherwise. Narell v. Freeman, 872 F.2d 907, 910 (9th Cir. 1989); see also Association of American Medical Colleges v. Cuomo, 928 F.2d 519, 524 (2d Cir. 1991).

   The defense of fair use, originally

judge-made, now codified, plays an essential role in copyright law. Without it, any copying of copyrighted material would be a copyright infringement. A book reviewer could not quote from the book he was reviewing without a license from the publisher. Quite apart from the impairment of freedom of expression that would result from giving a copyright holder control over public criticism of his work, to deem such quotation an infringement would greatly reduce the credibility of book reviews, to the detriment of copyright owners as a group, though not to the owners of copyright on the worst books. Book reviews would no longer serve the reading public as a useful guide to which books to buy. Book reviews that quote from ("copy") the books being reviewed increase the demand for copyrighted works; to deem such copying infringement would therefore be perverse, and so the fair-use doctrine permits such copying. Desnick v. American Broadcasting Companies, Inc., 44 F.3d 1345, 1351 (7th Cir. 1995) (dictum); William M. Landes, "Copyright, Borrowed Images, and Appropriation Art: An Economic Approach," 9 Geo. Mason L. Rev. 1, 10 (2000); Lawrence Lessig, "The Law of the Horse: What Cyberlaw Might Teach," 113 Harv. L. Rev. 501, 528 (1999). On the other hand, were a book reviewer to quote the entire book in his review, or so much of the book as to make the review a substitute for the book itself, he would be cutting into the publisher's market, and the defense of fair use would fail. Harper & Row, Publishers, Inc. v. Nation Enterprises, 723 F.2d 195, 215 (2d Cir. 1983) (dissenting opinion), rev'd, 471 U.S. 539 (1985); see Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 562 (1985); Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F.3d 1110, 1118 (9th Cir. 2000); Consumers Union of United States, Inc. v. General Signal Corp., 724 F.2d 1044, 1051 (2d Cir. 1983).

Generalizing from this example in economic terminology that has become orthodox in fair-use case law, we may say that copying that is complementary to the copyrighted work (in the sense that nails are complements of hammers) is fair use, but copying that is a substitute for the copyrighted work (in the sense that nails are substitutes for pegs or screws), or for derivative works from the copyrighted

work, see 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright sec. 13.05[B][1], p. 13-193 (2002), is not fair use. On Davis v. The Gap, Inc., 246 F.3d 152, 175-76 (2d Cir. 2001); Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1277 (11th Cir. 2001) (concurring opinion); Wendy J. Gordon, "Fair Use as Market Failure: A Structural and Economic Analysis of the Betamax Case and Its Predecessors," 82 Colum. L. Rev. 1600, 1643 n. 237 (1982); see Consumers Union of United States, Inc. v. General Signal Corp., supra, 724 F.2d at 1051. If the price of nails fell, the demand for hammers would rise but the demand for pegs would fall. The hammer manufacturer wants there to be an abundant supply of cheap nails, and likewise publishers want their books reviewed and wouldn't want reviews inhibited and degraded by a rule requiring the reviewer to obtain a copyright license from the publisher if he wanted to quote from the book. So, in the absence of a fair-use doctrine, most publishers would disclaim control over the contents of reviews. The doctrine makes such disclaimers unnecessary. It thus economizes on transaction costs.

The distinction between complementary and substitutional copying (sometimes--though as it seems to us, confusingly--said to be between "transformative" and "superseding" copies, see, e.g., Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994)) is illustrated not only by the difference between quotations from a book in a book review and the book itself, Marion B. Stewart, "Calculating Economic Damages in Intellectual Property Disputes: The Role of Market Definition," 77 J. Patent & Trademark Office Society 321, 332 (1995), but also by the difference between parody (fair use) and burlesque (often not fair use). A parody, which is a form of criticism (good-natured or otherwise), is not intended as a substitute for the work parodied. But it must quote enough of that work to make the parody recognizable as such, and that amount of quotation is deemed fair use. Campbell v. Acuff-Rose Music, Inc., supra, 510 U.S. at 579, 580-81 and n. 14, 588; Suntrust Bank v. Houghton Mifflin Co., supra, 268 F.3d at 1271; Leibovitz v. Paramount Pictures Corp., 137 F.3d 109, 114 (2d Cir. 1998); Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1400 (9th Cir.

1997); 4 Nimmer & Nimmer, supra, sec. 13.05[C], pp. 13-203 to 13-218. A burlesque, however, is often just a humorous substitute for the original and so cuts into the demand for it: one might choose to see Abbott and Costello Meet Frankenstein or Young Frankenstein rather than Frankenstein, or Love at First Bite rather than Dracula, or even Clueless rather than Emma. Burlesques of that character, catering to the humor-loving segment of the original's market, are not fair use. Benny v. Loew's Inc., 239 F.2d 532, 536-37 (9th Cir. 1956), aff'd by an equally divided Court under the name Columbia Broadcasting System, Inc. v. Loew's, Inc., 356 U.S. 43 (1958) (per curiam); see 4 Nimmer & Nimmer, supra, sec. 13.05[B][1], pp. 13-194 to 13-195, sec. 13.05[C]; cf. Campbell v. Acuff-Rose Music, Inc., supra, 510 U.S. at 580-81 & n. 14, 591. The distinction is implicit in the proposition, affirmed in all the cases we have cited, that the parodist must not take more from the original than is necessary to conjure it up and thus make clear to the audience that his work is indeed a parody. If he takes much more, he may begin to attract the audience away from the work parodied, not by convincing them that the work is no good (for that is not a substitution effect) but by providing a substitute for it.

Book reviews and parodies are merely examples of types of work that quote or otherwise copy from copyrighted works yet constitute fair use because they are complements of (though sometimes negative complements, as in the case of a devastating book review) rather than substitutes for the copyrighted original. The commonest type is simply a quotation from a copyrighted work in a book or article on the same or a related subject. The complementary effect may be quite weak, but the quotation is unlikely to reduce the demand for the copyrighted work; nor could the copyright owner command a license fee commensurate with the costs of transacting with the copier. Such copying is therefore fair use.

Were control of derivative works not part of a copyright owner's bundle of rights, it would be clear that PIL's books fell on the complement side of the divide and so were sheltered by the fair-use defense. A photograph of a Beanie

Baby is not a substitute for a Beanie Baby. No one who wants a Beanie Baby, whether a young child who wants to play with it or an adult (or older child) who wants to collect Beanie Babies, would be tempted to substitute a photograph. But remember that photographs of Beanie Babies are conceded to be derivative works, for which there may be a separate demand that Ty may one day seek to exploit, and so someone who without a license from Ty sold photographs of Beanie Babies would be an infringer of Ty's sculpture copyrights. The complication here is that the photographs are embedded in text, in much the same way that quotations from a book are embedded in a review of the book. Ty regards the text that surrounds the photographs in PIL's Beanie Baby books as incidental; implicitly it compares the case to one in which a book reviewer quotes the whole book in his review. Or to a case in which a purveyor of pornographic pictures pastes a copy of the Declaration of Independence on the back of each picture and argues that judged as a whole his product has redeeming social value. United States v. A Motion Picture Film Entitled "I Am Curious-Yellow," 404 F.2d 196, 201 (2d Cir. 1968) (Friendly, J., concurring); see Valentine v. Chrestensen, 316 U.S. 52 (1942). PIL argues, to the contrary, that the photographs are indispensable to the creation of a collectors' guide to Beanie Babies; and, as we'll see shortly, collectors' guides are not derivative works.

The proper characterization of PIL's Beanie Baby books is the kind of fact-laden issue appropriate for summary judgment only in extreme cases, which this case is not--in part because of differences among the books that the dis trict court found infringed Ty's copyright. At one end of the spectrum is For the Love of Beanie Babies. This large-print book with hard shiny covers seems directed at a child audience. All the different Beanie Babies, more than 150 of them, are pictured. Each picture is accompanied by a brief commentary. Some of the commentary seems aimed exclusively at a child (or infantile adult) audience, such as the commentary on Snip the Siamese Cat: "That darn cat has nerve! Just like the real thing, Ty's Siamese has plenty of attitude. The

champagne-colored cat with blue-ringed black eyes and chocolate-covered points is a beautiful specimen of the Far Eastern breed. And she knows it! Stretched out on all fours, this finicky feline is the only purebred in Ty's cathouse. This pretty kitty is definitely the cat's meow." The commentary seems distinctly secondary to the photograph. An even clearer case is a two-page spread in For the Love of Beanie Babies entitled "Kitty Corner," which we reproduce (without Ty's permission!--a good example of the fair-use doctrine in action) at the end of this opinion. The text is childish and pretty clearly secondary to the more than full-page photograph of feline Beanie Babies. Some of the commentary on photographs in For the Love of Beanie Babies does contain information relevant to collectors, such as "mint-condition Allys with older tags are very difficult to find. Retired." ("Retired" means no longer being manufactured.) But For the Love of Beanie Babies might well be thought essentially just a collection of photographs of Beanie Babies, and photographs of Beanie Babies are derivative works from the copyrighted Beanie Babies themselves.

At the opposite extreme is PIL's Beanie Babies Collector's Guide. This is a small paperback book with small print, clearly oriented toward adult purchasers--indeed, as the title indicates, toward collectors. Each page contains, besides a photograph of a Beanie Baby, the release date, the retired date, the estimated value of the Beanie Baby, and other information relevant to a collector, such as that "Spooky is the only Beanie ever to have carried his designer's name," or that "Prance should be a member of the Beanie line for some time, so don't panic and pay high secondary-market prices for her just because she's fairly new."

Some of the text is quite critical, for example accusing Ty of frequent trademark infringements. Ty doesn't like criticism, and so the copyright licenses that it grants to those publishers whom it is willing to allow to publish Beanie Baby collectors' guides reserve to it the right to veto any text in the publishers' guides. It also forbids its licensees to reveal that they are licensees of Ty. Its standard licensing agreement requires the licensee to print on the title page and

back cover of its publication the following misleading statement: "This publication is not sponsored or endorsed by, or otherwise affiliated with Ty Inc. All Copyrights and Trademarks of Ty Inc. are used by permission. All rights reserved." Notice the analogy to a publisher's attempting to use licensing to prevent critical reviews of its books--an attempt that the doctrine of fair use blocks. See Suntrust Bank v. Houghton Mifflin Co., supra, 268 F.3d at 1277 (concurring opinion). We need not consider whether such a misleading statement might constitute copyright misuse, endangering Ty's copyrights. See, e.g., A & M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1026-27 (9th Cir. 2001): Practice Management Information Corp. v. American Medical Association, 121 F.3d 516, 520 (1997), amended, 133 F.3d 1140 (9th Cir. 1998); Lasercomb America, Inc. v. Reynolds, 911 F.2d 970, 976 (4th Cir. 1990).

But we do need to explain the oddity of there being collectors' guides for a line of children's toys; otherwise it might seem clear that the Beanie Babies Collector's Guide was a device for circumventing Ty's lawful monopoly of derivative works. As a marketing gimmick, Ty deliberately creates a shortage in each Beanie Baby by selling it at a very low price and not producing enough copies to clear the market at that price. As a result, a secondary market is created, just like the secondary market in works of art. The secondary market gives widespread publicity to Beanie Babies, and the shortage that creates the secondary market stampedes children into nagging their parents to buy them the latest Beanie Babies, lest they be humiliated by not possessing the Beanie Babies that their peers possess. Ty, Inc. v. GMA Accessories, Inc., supra, 132 F.3d at 1171, 1173. The appeal is to the competitive conformity of children--but also to the mentality of collectors.

When Beanie Babies Collector's Guide was published in 1998, some Beanie Babies were selling in the secondary market for thousands of dollars, while others were selling for little more than their original purchase price. The range was vast, creating a demand for collectors' guides. Ty acknowledges as it must that a collectors' guide to a series of

copyrighted works is no more a derivative work than a book review is. We cannot find a case on the point but the Copyright Act is clear. It defines a derivative work as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. sec. 101. A derivative work thus must either be in one of the forms named or be "recast, transformed, or adapted." Lee v. A.R.T. Co., 125 F.3d 580, 582 (7th Cir. 1997). The textual portions of a collectors' guide to copyrighted works are not among the examples of derivative works listed in the statute, and guides don't recast, transform, or adapt the things to which they are guides. A guide to Parisian restaurants is not a recasting, transforming, or adapting of Parisian restaurants. Indeed, a collectors' guide is very much like a book review, which is a guide to a book and which no one supposes is a derivative work. Both the book review and the collectors' guide are critical and evaluative as well as purely informational; and ownership of a copyright does not confer a legal right to control public evaluation of the copyrighted work.

Ty's concession that a Beanie Babies collectors' guide is not a derivative work narrows the issue presented by PIL's appeal nicely (at least as to those books that are plausibly regarded as collectors' guides) to whether PIL copied more than it had to in order to produce a marketable collectors' guide. Ty points out that PIL's books copied (more precisely, made photographic copies of) the entire line of Beanie Babies, just like the book reviewer who copies the entire book. But the cases are clear that a complete copy is not per se an unfair use, see, e.g., Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417, 447-50 (1984); id. at 480 (dissenting opinion); Worldwide Church of God v. Philadelphia Church of God, Inc., supra, 227 F.3d at 1118, and the suggested analogy overlooks the fact that a collectors' guide, to compete in the marketplace, has to be comprehensive. Given that Ty can license (in fact has licensed) the publication of

collectors' guides that contain photos of all the Beanie Babies, how could a competitor forbidden to publish photos of the complete line compete? And if it couldn't compete, the result would be to deliver into Ty's hands a monopoly of Beanie Baby collectors' guides even though Ty acknowledges that such guides are not derivative works and do not become such by being licensed by it. Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., 150 F.3d 132, 145 n. 11 (2d Cir. 1998) ("by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work, a copyright owner plainly cannot prevent others from entering those fair use markets"); see Sony Computer Entertainment, Inc. v. Connectix Corp., 203 F.3d 596, 607-08 (9th Cir. 2000); Twin Peaks Productions, Inc. v. Publications Int'l, Ltd., 996 F.2d 1366, 1377 (2d Cir. 1993) ("the author of 'Twin Peaks' cannot preserve for itself the entire field of publishable works that wish to cash in on the 'Twin Peaks' phenomenon").

Granted, there is some question how, if Beanie Babies collectors' guides are indeed a complement to Beanie Babies (and they are), and Ty has a monopoly of Beanie Babies (and it does), Ty can get a second monopoly profit by taking over the guides market. The higher the price it charges for guides, the lower will be the demand for such guides and hence for collecting Beanie Babies and so the less effective will Ty's strategy of marketing Beanie Babies as collectibles be. This is the sort of question that has engendered skepticism among economists about the antitrust rule against tie-in agreements. But there is an answer here: Ty wants to suppress criticism of its product in these guides.

Ty goes so far as to argue that PIL not only cannot publish photos of all the Beanie Babies but cannot publish color photos of any of them, and perhaps cannot publish black and white photos of any of them or even sketches but must instead be content with the name of the Beanie Baby and a verbal description. Such a guide would sink like a stone in the marketplace no matter how clever and informative its text, since Ty licenses publishers to publish photos of all the

Beanie Babies in the licensees' collectors' guides. It would be like trying to compete with a CD of Beethoven's Fifth Symphony by selling the score.

We have thus far discussed the application of the fair-use doctrine in terms of the purpose of the doctrine rather than its statutory definition, which though extensive is not illuminating. (More can be less, even in law.) The statute provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . scholarship or research, is not an infringement of copyright." 17 U.S.C. sec. 107. (Notice that the purposes listed are illustrative rather than comprehensive. Campbell v. Acuff-Rose Music, Inc., supra, 510 U.S. at 577-78.) In deciding whether a particular use is fair, the "factors to be considered shall include"--and notice again that the listing is illustrative rather than exhaustive; Congress "intended that courts continue the common law tradition of fair use adjudication" and [section 107] "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity which that law is designed to foster," id. at 577--"(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." Factors (1) and (2) are empty, except that (1) suggests a preference for noncommercial educational uses, picking up the reference earlier in the statute to "teaching . . . scholarship or research." Factor (3) is inapplicable to Beanie Babies, each one of which is copyrighted separately, so that there can be no partial copying as a matter of fact (no one, we imagine, wants a photograph of part of a Beanie Baby). Factor (4) at least glances at the distinction we noted earlier between substitute and complementary copying, since the latter does not impair the potential market or value of the copyrighted work except insofar as it criticizes the work, which is the

opposite of taking a free ride on its value.

   The important point is simply that, as the Supreme Court made clear not only in Campbell but also in Sony Corp. v. Universal City Studios, supra, 464 U.S. at 448-49 n. 31, the four factors are a checklist of things to be considered rather than a formula for decision; and likewise the list of statutory purposes. See also Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., supra, 150 F.3d at 141; Ringgold v. Black Entertainment Televison, Inc., 126 F.3d 70, 78 and n. 9 (2d Cir. 1997). Because the factors and purposes are not exhaustive, Ty can get nowhere in defending the judgment by arguing that some or even all of them lean against the defense of fair use. The question is whether it would be unreasonable to conclude, with reference to one or more of the enjoined publications, such as the Beanie Babies Collector's Guide, that the use of the photos is a fair use because it is the only way to prepare a collectors' guide.

   Ty relies primarily on two cases. Twin Peaks Productions, Inc. v. Publications International, Ltd., supra, involved a book published by PIL concerning a television series. The book included a detailed recounting of the plot of the first eight episodes: "every intricate plot twist and element of character development appear in the Book in the same sequence as in the teleplays." 996 F.2d at 1373. The court held that the book was basically an abridgment of the script and that abridgments (despite contrary, aged authority) are generally not fair use. Id. at 1375-76. The plot summaries were so extensive as to be substitutes for rather than complements of the copyrighted scripts.

   The other case on which Ty principally relies, Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., supra, involved another television series, Seinfeld, and another book, The Seinfeld Aptitude Test, a collection of trivia questions testing viewers' knowledge of obscure details of the series' plot and characters. There was evident complementarity: people who bought the book had to watch the show in order to pick up the answers to the questions in

the book; no one would read the book in lieu of watching the show. When the book first appeared, the show's producers requested free copies and distributed them as promotional material, 150 F.3d at 136; and the book's blurb told readers to "open this book to satisfy your between-episode cravings." Id. The court nevertheless held that the book wasn't insulated from copyright liability by the doctrine of fair use. The holding seems to rest in part, and very dubiously we must say, on the court's judgment that the book was frivolous. Id. at 146: "Undoubtedly, innumerable books could 'expose' the 'nothingness' or otherwise comment upon, criticize, educate the public about, or research Seinfeld and contemporary television culture. The [Seinfeld Aptitude Test], however, is not such a book." But the fair-use doctrine is not intended to set up the courts as judges of the quality of expressive works. See Campbell v. Acuff-Rose Music, Inc., supra, 510 U.S. at 582-83. That would be an unreasonable burden to place on judges, as well as raising a First Amendment question.

But there was more to the court's decision. The Seinfeld Aptitude Test may have been a subterfuge for copying the script of the television series--and the script was a derivative work. The court said that "each 'fact' tested by The SAT is in reality fictitious expression created by Seinfeld's authors. The SAT does not quiz such true facts as the identity of the actors in Seinfeld, the number of days it takes to shoot an episode, the biographies of the actors, the location of the Seinfeld set, etc. Rather, The SAT tests whether the reader knows that the character Jerry places a Pez dispenser on Elaine's leg during a piano recital, that Kramer enjoys going to the airport because he's hypnotized by the baggage carousels, and that Jerry, opining on how to identify a virgin, said 'It's not like spotting a toupee.'" Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc., supra, 150 F.3d at 139. A similar judgment might be possible here with regard to For the Love of Beanie Babies, which we described as basically just a picture book; and the pictures are derivative works from Ty's copyrighted soft sculptures. This raises the question whether, while summary judgment is plainly not warranted with

regard to all the books that the district court found infringed Ty's copyrights, it might be warranted with regard to some of them, specifically For the Love of Beanie Babies. However, three reasons counsel against this course. The first is that the record actually contains not one but three versions of For the Love of Beanie Babies, and our earlier description was of the one furthest removed from a collectors' guide; the others are closer. Second, Ty is not asking us to consider the appropriateness of partial summary judgment. Third, and related to the second point, the briefs do not analyze the various books separately, making us reluctant to rule separately on them. We do not preclude consideration on remand of the possibility of partial summary judgment.

The Rule 54(b) judgment (including of course the award of attorneys' fees to Ty) must, however, be reversed. For guidance on remand, we add that the district court also erred in refusing to apportion PIL's profits between those attributable to the photos and those attributable to the text. PIL's Beanie Baby books would have commanded lower prices in the marketplace had they had no text, and they would therefore have generated lower profits as well unless, as we doubt, the text is very costly to create. All that Ty is entitled to if it proves infringement on remand is the profits attributable to the photos, 17 U.S.C. sec. 504(b), a smaller amount than PIL's actual profits, although PIL would have the burden of proving how much smaller. Id.; Harper & Row, Publishers, Inc. v. Nation Enterprises, supra, 471 U.S. at 567; Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 402, 405-06 (1940); Business Trends Analysts, Inc. v. Freedonia Group, Inc., 887 F.2d 399, 407 (2d Cir. 1989).
Reversed and Remanded.

"Kitty Korner" (from For the Love of Beanie Babies)