M. SMITH, Circuit Judge,
dissenting:
I respectfully dissent. Copyright is not an inviolable right that confers upon creators absolute control and ownership over their creations. Copyright protection was enacted “[t]o promote the Progress of Science and useful Arts” by creating a system in which authors and artists may reap the benefits of their creative contributions. U.S. Const. art. I, § 8, cl. 8. The fair use doctrine was designed to act as the counterbalance to copyright by “permitting] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.” Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (internal citation and quotations omitted).
The majority’s fair use analysis in this case is inconsistent with Supreme Court precedent, and thwarts the public interests of copyright by allowing newsworthy public figures to control their images in the press. The majority contends that the public interest in a free press cannot trump a celebrity’s right to control his image and works in the media — even if that celebrity has publicly controverted the very subject matter of the works at issue. Under the majority’s analysis, public figures could invoke copyright protection to prevent the media’s disclosure of any embarrassing or incriminating works by claiming that such images were intended only for private use. The implications of this analysis undermine the free press and eviscerate the principles upon which copyright was founded. Although newsworthiness alone is insufficient to invoke fair use, public figures should not be able to hide behind the cloak of copyright to prevent the news media from exposing their fallacies. Accordingly, because three of the photos directly proved the fact of the Noelia Monge’s and Jorge Reynoso’s (the Couple) marriage, I would affirm the district court’s finding of fair use as to those wedding photos. However, because the remaining two photos did not directly prove the Couple’s wedding and therefore may have been unnecessary to the story, I would remand on the grounds that genuine issues of material fact exist, precluding summary judgment.[1]
I. FAIR USE ANALYSIS
The fair use analysis consists of a four-part test, considering:
(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
*1185 (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.
17 U.S.C. § 107.
The majority contends that none of these fair use factors weighs in favor of Maya Magazines’s (Maya) fair use of the Couple’s wedding photos. I respectfully disagree with the majority’s analysis, and I address each of the factors in turn.
A. Purpose and, Character of Use
The transformative use analysis is an integral question under the first factor, and in fair use generally. Campbell, 510 U.S. at 579, 114 S.Ct. 1164 (explaining that transformative uses “lie at the heart of the fair use doctrine[ ]”); see also 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.05[a][1][B] (Matthew Bender rev. ed.2012). “The central purpose of [the purpose and character inquiry] is to see ... whether the new work merely ‘supersede^] the objects’ of the original creation ... or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message.” Campbell, 510 U.S. at 579, 114 S.Ct. 1164 (citations omitted). The use of photographic evidence to prove a “controversial,” “salacious,” or controverted fact weighs in favor of a finding of fair use. Murphy v. Millennium Radio Grp. LLC, 650 F.3d 295, 306 (3d Cir.2011); see also Núñez v. Caribbean Int’l News Corp., 235 F.3d 18, 22 (1st Cir.2000) (finding fair use of nude and semi-nude photographs in controversy over the qualifications of Miss Puerto Rico Universe); Fitzgerald v. CBS, Inc., 491 F.Supp.2d 177, 186 n. 2 (D.Mass. 2007) (explaining that “recontextualization” of a photo may be transformative when publication is relevant to a newly developed matter of public concern). In the case of photographic works, a use may be found to be transformative if it complements the original work, rather than supersedes it. Ty, Inc. v. Publ’ns Int’l, Ltd., 292 F.3d 512, 518 (7th Cir.2002). Ultimately, the more transformative the use, the less other factors, such as commerciality, weigh against a finding of fair use. Campbell, 510 U.S. at 579, 114 S.Ct. 1164.
The majority contends that Maya’s use of the photos was not transformative because (1) the photos were minimally changed with limited commentary; (2) the photos were offered for the exact same purpose — to document the wedding; and (3) the newsworthiness of the photos was insufficient to support a finding of fair use. I respectfully disagree on all three points.
1. Editing, Arrangement, and Commentary
The majority attempts to diminish the significance of Maya’s commentary, cropping, re-sizing, and arrangement of the photos by presenting the publication as little more than a photo album. This is simply not accurate. The February 10, 2009 exposé consisted of a stylized two-page spread: on the left page was a full length image of Reynoso and Noelia embracing in the wedding chapel (originally cropped on the front cover), accompanied by a red text box on the lower left hand corner, with the print:
Definitely, Noelia never ceases to amaze us. Whether it is her fights with her mother, her allegations of sexual abuse, her pornographic videos, her problems with the press or the behavior of her partner, Jorge Reynoso, the Puerto Rican singer always takes over the headlines, and this time is no exception. In fact, a lot has been said about a supposedly secret wedding in Las Vegas, Nevada, that took place in January 2007, but until now, no one had shown photos of that memorable day. TVNotas got a *1186 hold of those photos and shows them to you now, exclusively.
The second page consisted of a full page, four-photo montage: first, a different wedding picture of Noelia and Reynoso, next to the minister who married them, in the same wedding clothing, in the same chapel, with the caption, “POSING WITH THE MINISTER OF THEIR MARRIAGE,” and accompanying the inset text, “Noelia Lorenzo-Monge and Jorge Reynoso looked happy, she in her stretch mini dress and a garter, he in a suit and tie.” To the immediate right of that, a close up photo of Noelia and Reynoso kissing, with two inset captions, above “THEIR FIRST KISS AS MAN AND WIFE” and below, with the accompanying inset text, “After years of a relationship, Reynoso finally came through for her.” In the second row, to the left was a photo of Noelia posing next to a seated Reynoso in a bar, his arm around Noelia and a cigar in his hand, with the caption above, “THEY WENT TO A BAR.”[2] Finally, to the right of that, a fourth photo of Noelia, laying on the bed in the same stretch white mini dress and black knee high boots, exposing her underwear and looking seductively at the camera, with the above caption, “THIS IS HOW THE SINGER ENDED UP IN THE NUPTIAL SUITE,” also accompanied by a smaller caption inset, “Flirty, suggestive and happy, as every wife would be, the Singer posed ready for her wedding night.” At the bottom of the page in bold, large black and white print read: “Though they didn’t want to confirm their marriage, these images speak for themselves.”
Maya’s article constituted much more than a haphazard republication of the Couple’s photos. Framed around the Couple’s refusals to confirm their marriage and to continue to represent Noelia as an “unwed sex symbol,” Maya used the images as documentary evidence. We, as well as our sister circuits, have held that a photo montage, with accompanying commentary, may constitute a transformative use. See Núnez, 235 F.3d at 22 (finding transformative use of photographs in news story where “the pictures were shown not just to titillate, but also to inform”), L.A. News Serv. v. KCAL-TV Channel 9, 108 F.3d 1119, 1122 (9th Cir.1997) (finding a montage of images of the Los Angeles riots, rather than a mere rebroadcast of the original film, transformative). Maya’s commentary, editing, and arrangement of the photos added to, and ultimately changed, the original character of the images by advancing them as the basis of an exposé. The extent of Maya’s editing, commentary, and arrangement thus weighs in favor of a finding of transformativeness. Campbell, 510 U.S. at 579, 114 S.Ct. 1164.
2. Different Purpose
The majority contends: “[i]n one sense, the parties’ purposes are identical: Photographic documentation of the wedding.” However, the majority repeatedly confuses the original subject matter of the photos with the intended use of the images. For the Couple, these were personal images, originally taken to capture the night of their marriage. After they were married, however, the photos were kept secret for the Couple’s commercial gain. As Reynoso testified, the images were withheld from the public solely for “marketing” purposes, in order to maintain Noelia’s “image of being a single singer appeal to young people.” [3] (“Q: Why did you decide to have a secret wedding? A: I just mentioned to *1187 you that we’re trying to protect her image of being a single singer to appeal to young people ... Q: Were there any other reasons? A: No, just marketing reasons.”). For Maya, the photos were used as direct, documentary evidence of a clandestine wedding that had been hidden from the public for years, disproving the Couple’s representations to the contrary. Indeed, media speculation regarding their relationship — even referring to them as husband and wife — had occurred years before the publication of the TVNotas expose in February 2009. Thus, the exposé served an entirely different purpose — indeed, a purpose contrary to the Couple’s original intent to record and conceal their Las Vegas wedding. See Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L.Rev. 1105, 1111 (1990) (“Transformative uses may include criticizing the quoted work, exposing the character of the original author, proving a fact, or summarizing an idea argued in order to defend or rebut it.”) (emphasis added). Accordingly, I would find that the fundamentally different purpose of Maya’s use also weighs in favor of a finding of transformativeness.
3. Newsworthiness
The majority misguidedly relies on Harper & Row to criticize newsworthiness as a basis for fair use. However, Harper & Row is distinguishable on two critical points: (1) the excerpts at issue were soon-to-be published in a hard-cover memoir by their author, President Gerald Ford, and rights to publish excerpts had already been bid on, and sold to, competing magazines; and (2) Ford had never concealed or controverted the facts at issue in the infringing excerpts. 471 U.S. at 563-64, 105 S.Ct. 2218.
Specifically, Harper & Row involved the surreptitious publication by a magazine, The Nation, of critical excerpts of Gerald Ford’s soon-to-be published memoirs regarding the Nixon pardon (“A Time to Heal”). The Nation published the excerpts for commercial gain in an effort to “scoop” the hardcover release, as well as its competitors, who had rightfully bid for publication rights. Harper & Row, 471 U.S. at 563-64, 105 S.Ct. 2218. Here, there was no such subterfuge. The Couple had concealed the truth of their relationship from the public, and even from their close friends and family. The photographs proved not only their marriage, but when, where, and how it took place, and for how long the Couple had hidden the truth. In short, Maya’s exposé constituted a transformative use because it “shed[] light” upon the Couple’s covert nuptials. See Campbell, 510 U.S. at 579, 114 S.Ct. 1164.
The majority contends that if a work is created for “private use,” and then subsequently published without permission because it is newsworthy, that the publication cannot constitute a fair use. The logical extension of the majority’s reasoning could produce absurd results. If public, newsworthy figures were permitted to invoke a “private use” exception, Tiger Woods, for example, could have claimed copyright in his sexting messages and, without fair use, the media would have no right to quote them.[4] Likewise, without a *1188 fair use defense, the media would have only been able to describe former Congressman Anthony Weiner’s self-portraits, rather than reprint the images themselves. Thus, the majority attempts to distinguish Maya’s use of the wedding photos from “legitimate” fair uses — namely, when the “content of the photographs is the story.” In so doing, the majority oversimplifies Maya’s use of the images and superimposes the court as the final arbiter of what is sufficiently “salacious” or “controversial” to constitute a “legitimately” fair use. This is a “dangerous” intrusion upon both the sanctity of the free press and copyright. See Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251, 23 S.Ct. 298, 47 L.Ed. 460 (1903) (Holmes, J.) (“It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations, outside of the narrowest and most obvious limits.”).
The majority’s proposed test would effectively vest in the courts the power to circumscribe news stories and the sources upon which the media may rely. The line between when a copyrighted work “is the story” and when it is not is not nearly as clear as the majority contends. Thus, if the “story” of Tiger Woods’ infidelities was limited to merely exposing his multiple mistresses, the majority’s test would still prohibit the “fair use” of his sexts because his liaisons could be proven by other, non-copyrighted sources. Likewise, it is unclear whether republication of former Congressman Weiner’s seminude tweets and graphic Facebook messages would be deemed entirely necessary to investigate the organized “cover-up” of his online trysts. News stories have multiple purposes, layers, and facets and, by their nature, evolve over time. Here, while the TVNotas article began as a factual exposé, the story did not end there. Noelia and Reynoso were celebrities who carefully concealed their relationship to maintain Noelia’s image as a single sex symbol. Maya’s use of the photos was thus integral to exposing to the public the depth of their relationship and the actual events of their secret Vegas wedding night — the venue, the clothing, the after-party. Contrary to the majority’s contentions, a mere marriage certificate would not suffice.
Accordingly, I would reject the majority’s approach and hold that the fundamentally different purpose underlying Maya’s publication of the photos constituted a transformative use, and thus counterbalanced the commerciality of the use such that the first favor weighs in favor of a finding of fair use.
B. Nature of Copyrighted Works
In determining the nature of the original work, we decide “first, the extent to which it is a creative work enjoying broader copyright protection as opposed to a factual work requiring broader dissemination, ... and second, whether it is unpublished, in which case the right of first publication is implicated.” Núñez, 235 F.3d at 23 (citing Harper & Row, 471 U.S. at 563-64, 105 S.Ct. 2218) (emphases added). Because “[t]he law generally recognizes a greater need to disseminate factual works,” the “nature of the work” inquiry is designed to distinguish between the levels of “core” protectability of copyright. Harper & Row, 471 U.S. at 563, 584 n. 7, 105 S.Ct. 2218 (Brennan, J., dissenting). Indeed, we have held that where a copyrighted work is “informational and factual and news; each characteristic strongly favors [a finding of fair use].” L.A News Serv. v. *1189 CBS Broad., Inc., 305 F.3d 924, 939-40 (9th Cir.), as amended, 313 F.3d 1093 (9th Cir.2002). The tiered approach thus reflects the understanding that certain types of works — namely, fictional, creative, and unpublished works — fall closer to the core of copyright, and other types of works— namely, factual, informative, and published works — enjoy generally less protection. Id.
The majority reasons that the nature of the original photographs weighs against a finding of fair use because they were unpublished. The majority’s analysis is flawed on two grounds: (1) the majority ignores the threshold determination that the photos were factual and documentary in nature; and (2) even if the unpublished nature of the work did cut against a finding of fair use, the majority fails to address the fact that the “nature of the work” analysis is much less significant in cases of transformative use.
The majority concedes that the photographs were essentially factual in nature, noting that the images were taken as “[pjhotographie documentation of the wedding” and characterizing the photos as “point-and-shoot,” and thus “not highly artistic in nature.” Thus, as a threshold matter, the factual and informative nature of the photographs places them outside the core of copyright protection. See Campbell, 510 U.S. 569, 114 S.Ct. 1164; see also Kelly v. Arriba Soft Corp., 336 F.3d 811, 820 (9th Cir.2003). While the photos were admittedly unpublished, this factor is less significant because the photographs were documentary in nature. See Narell v. Freeman, 872 F.2d 907, 914 (9th Cir.1989) (“The scope of permissible fair use is greater with an informational work than a creative work.”); see also Stewart v. Abend, 495 U.S. 207, 237-38, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). Moreover, even if the unpublished nature of the photos did undercut their factual character, any possible impact is further mitigated by the fact that Maya’s exposé constituted a transformative use. Although the majority attempts to use the unpublished nature of the works to trump their factual character and Maya’s transformative use, we have held in cases of transformative use, the nature of the work carries less significance. See Mattel Inc. v. Walking Mountain Prods., 353 F.3d 792, 803 (9th Cir. 2003) (explaining that when dealing with transformative uses, the second factor is much less significant in the overall fair use analysis). Accordingly, I would hold that the second factor weighs either neutrally or slightly in favor of a finding of fair use.
C. Substantiality of Use
When excerpts of a work or compilation of works are taken to tell a narrative different from, and independent of, the collection in its entirety, we may consider the selection and proportion of the excerpts used against the collection as a whole. See generally Ty, 292 F.3d at 522-23 (explaining that use of copyright works that exist within a greater collection, e.g., the full collection of Beanie Babies used in a comprehensive guide or the use of particular quotes in a book review, may constitute fair use if used to serve an acceptable purpose). Although taking the “heart” of a work generally weighs against a finding of fair use, selectivity in using only what is necessary cuts both ways and must be considered in evaluating the amount and substantiality of the use. See L.A. News Serv., 305 F.3d at 941.
The majority concludes that because Maya minimally cropped and altered the five wedding photographs that, qualitatively and quantitatively, the substantiality of the use weighs against a finding of fan-use. Without citation to any legal authority, the majority reasons that the district court committed clear error by reasoning that the amount and substantiality of the *1190 use supported a finding of fair use because the Maya only used five of approximately four hundred photos and three videos available to it on the memory disk. The majority’s analysis lacks any basis in law or fact.
Contents unseen, Maya purchased a memory disk of four hundred photos and three videos of Noelia and Reynoso. Maya paid for that disk, in its entirety, as a compilation. Indeed, the paparazzo, Oscar Viqueira, received $1,500 for the disk, as a whole. From that disk, Maya culled through, extracted, and ultimately published five photos from the Couple’s secret wedding night to use in its photo montage exposé. Out of all of the possible photos that Maya could have selected from the disk, Maya chose those five because they told the story of the Couple’s clandestine nuptials in Las Vegas.
The majority fails to address, let alone refute, the impact of Maya’s selectivity because it contends that Maya’s use of the photographs must be evaluated individually since each photograph was copyrighted and registered individually. However, the majority fails to cite a single case for the proposition that, because images within a copyrightable compilation were individually registered, the amount and substantiality of the use must be evaluated on an individual basis. To the contrary, Nimmer observes, “The third factor listed in Section 107 is ‘the amount and substantiality of the portion used in relation to the copyrighted work as a whole.’ The ‘copyrighted work’ has been held not necessarily to correspond to the registered work.” 4 Nimmer on Copyright § 13.05[A][3] (footnotes omitted) (emphasis added).
As a matter of law, the district court could not have committed clear error because there is no binding legal authority contrary to the district court’s holding.[5] The record proves that the memory disk was the private property of Reynoso and Noelia, and that the images and the videos on the disk were related, personal images and videos of Reynoso and Noelia. Indeed, Juan Guadalupe Garcia Alejandro, Editor of TVNotas, testified that the four hundred photos and three videos on the disc were images of the Couple. The majority’s contention that the images were “unrelated” likewise contradicts record. The fact that the photos and videos on the disk consisted of the same subjects (Reynoso and Noelia) and, presumably, the same authors (Reynoso and Noelia) supports assessing the amount and substantiality of Maya’s use in light of the collection of the four hundred images and three videos on the disk. See generally Walt Disney & Co. v. Powell, 897 F.2d 565, 570 (D.C.Cir.1990) (treating individual photographs of same subject as compilation, even though individually registrable). The majority’s attempt to characterize Maya’s use of the six wedding photos as a “total appropriation” is simply inaccurate; the photographs were taken of the same subjects, fixed on the same medium, and paid for as part of a collective whole. Thus, the majority lacks any basis in either law or in fact to hold that each photograph must be evaluated individually.[6]
*1191 The reality is that Maya carefully selected the photos out of four hundred possible photos and videos on the disk because it wanted to use them to tell the wedding story. Three of those five photos depicted the wedding itself. The law dictates, at least as to the three photos that depicted the wedding ceremony, that Maya’s relative restraint in choosing only those photos supports a finding of fair use. See generally Ty, 292 F.3d at 522-23 (selectivity of images required to accomplish an acceptable purpose, even images used in their entirety, mitigates the substantiality of the use); cf. Los Angeles News Serv., 305 F.3d at 941. Admittedly, Maya’s use of the additional two other photos, of the Couple at the bar, and of Noelia on the nuptial bed, was not necessary to prove the story of their secret wedding. Maya’s use of these photos is thus qualitatively distinct from the three images directly depicting the wedding.[7] Accordingly, I would hold that, at least as to the three photos of the wedding ceremony, Maya’s selectivity and restraint from using more from the four hundred possible images and videos weighs either neutrally or slightly in favor of a finding of fair use.
D. Harm to Potential and Future Markets
The majority contends that the Couple’s intention never to release the photographs, let alone sell them, does not affect our analysis of harm to potential and future markets. The majority relies on Worldwide Church of God v. Philadelphia Church of God, Inc., 227 F.3d 1110 (9th Cir.2000) for the proposition that even if an author completely “disavowed any intention to publish his work during his lifetime” that unauthorized publication of the work by another could still harm potential and future markets. Id. at 1110, 1119. But the majority’s selective analysis mischaracterizes our holding in Worldwide Church of God. Id. at 1119. In Worldwide Church of God, we specifically exempted from the aforementioned reasoning publications involving “market failure,” in which an author specifically keeps a work from being published for the purposes of concealing information:
When an owner refuses to license because he is concerned that defendant’s work will substitute for his own work or derivative works, the owner is representing not only his own interest, but also the interest of his potential customers and thus the public interest. Market failure should be found only when the defendant can prove that the copyright owner would refuse to license out of a desire unrelated to the goals of eopyright-notably a desire to keep certain information from the public.
Id. at 1119 n. 2 (quoting Wendy Gordon, Fair Use As Market Failure: A Structur *1192 al and Economic Analysis of the Betamax Case and its Predecessors, 82 Colum. L.Rev. 1600, 1634 (1982)).
Here, the Couple’s intention never to publish photos must frame our market harm analysis because their intention was based upon their desire to conceal their secret Las Vegas wedding from the public. The fact that on the date of publication, nearly two years after them wedding, they had still refused to even tell their families, let alone the general public, proves this to be true. The application of the market failure exception makes sense here because the Couple sought to conceal their wedding out of their own interests, namely, to preserve Noelia’s image as a “sex symbol,” in spite of the common public interest in informing their fans and followers of the event. See Worldwide Church of God, 227 F.3d at 1119 n. 2 and accompanying text; see also Online Policy Grp. v. Diebold, Inc., 337 F.Supp.2d 1195, 1203 (N.D.Cal.2004) (finding Diebold’s subjective intent to conceal problems with its online voting software dispositive in its analysis of potential market harms). Accordingly, in light of the Couple’s intention to continue to conceal their Las Vegas nuptials, I would hold that the market failure harm exception to the harm to potential and future markets militates toward a finding of fair use.
CONCLUSION
“Overprotecting intellectual property is as harmful as underprotecting it. Creativity is impossible without a rich public domain.” White v. Samsung Elecs. Am., Inc., 989 F.2d 1512, 1513 (9th Cir.1993) (Kozinski, J., dissenting from order denying rehearing en banc). To satisfy a celebrity couple’s desire to control their public images, the majority extends inapposite case law to undercut the fair use doctrine and the free press. Rather than follow the majority’s course, I would affirm the district court’s grant of summary judgement on fair use grounds, at least as to the three images of the wedding in the exposé, and remand due to disputed issues of material fact regarding the use of the remaining two nonwedding photos.

. Registration is a prerequisite to sue under the Copyright Act of 1976. 17 U.S.C. § 411. Accordingly, the Couple may only recover for the five photographs for which they hold registrations. The Couple may not recover for the sixth photograph (taken of the two at a bar) as they do not hold the registration for it (it was taken by a bartender or waitress).

. The Couple did not register this photograph, accordingly, they may not sue for infringement. 17U.S.C. § 411.

. Reynoso been linked to other publicity stunts regarding Noelia’s image as well, including leaking her sex-tape with former-boyfriend.

. The majority implies that Woods’ sext messages and former Congressman Weiner's tweets and Facebook messages were public because they "distributed their ‘masterpieces' to others.” The majority’s contention is contrary to well-established copyright law. The Copyright Act defines "Publication” as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending.” 17 U.S.C. § 101 (emphasis added). Merely sending suggestive self-portraits or "sexts” to another, private person does not launch a work into the public domain. See, e.g., Salinger v. Random House, Inc., 811 F.2d 90, 96 (2d Cir. 1987) (emphasizing the private and unpublished nature of J.D. Salinger's person *1188 al letters). Woods’s "writings” were likely always intended to be kept secret between author and inspiration. And, but for one rogue tweet, former Congressman Weiner’s "works" were kept privately between him and his desired recipients.

. Indeed, the only legal authority the Majority cites even related to this proposition is Sawyer v. Whitley, 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), a Supreme Court case articulating the clear error standard in a habeas petition.

. The majority devotes a substantial portion of its analysis to characterizing the "amount and substantiality” of Maya's use as a “total appropriation.” The majority fails to address, however, the limited impact of this factor, as a whole, when a use has been deemed to be “transformative.” See Campbell, 510 U.S. at 579, 114 S.Ct. 1164. Both the district court and this dissent characterized the third factor as "neutral,” acknowledging facts that weighed both in favor of and against the fairness of the substantiality of Maya’s use. The more critical issue, here, is *1191 that the transformative purpose of Maya’s use, and the reasonableness of Maya’s use in light of its purpose, significantly limits the impact of the third factor on the overall fair use analysis. Castle Rock Entm’t, Inc. v. Carol Publ’g, 150 F.3d 132, 144 (2d Cir.1998) (emphasizing the importance of determining whether copying is “consistent with or more than necessary to further ‘the purpose and character of the use’ ” (quoting Campbell, 510 U.S. at 586-87, 114 S.Ct. 1164)).

. Here, I believe the interplay between the selectivity of the use and the appropriateness al summary judgment is critical. Summary judgment on fair use grounds is appropriate only if it is the only reasonable conclusion a trier of fact could reach in the case. See KCAL-TV Channel 9, 108 F.3d at 1123. Because two of the five photographs did not directly depict the wedding (one pictured the Couple at a bar in Las Vegas and the other featured Noelia, exposing her underwear on a hotel bed), I believe a genuine issue of material fact may exist as to the necessity of their publication in the wedding exposé.