**LOS ANGELES NEWS SERVICE,**
**Plaintiff–Appellant,**

v.

**KCAL-TV CHANNEL 9, Defendant–**
**Appellee.**

No. 95–55261.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 6, 1996.

Decided March 11, 1997.

William A. Bergen, Reseda, California, and Henry D. Fetter, Thomas Doniger, Doniger & Fetter, Los Angeles, California, for the plaintiff-appellant.

Jeffrey B. Valle, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, California, for the defendant-appellee.

Before: BRUNETTI and RYMER, Circuit Judges, and TANNER,* District Judge.

* Honorable Jack E. Tanner, Senior United States District Judge for the Western District of Washington, sitting by designation.

## OPINION

RYMER, Circuit Judge:

Los Angeles News Service (LANS) shot the Reginald Denny beating from its helicopter. Its videotape was copyrighted and licensed to the media. KCAL–TV used it, without a license. LANS sued for copyright infringement, but the district court granted summary judgment in KCAL's favor, holding that its telecasts of LANS's videotape were exempted from liability under the "fair use" doctrine. 17 U.S.C. § 107. We see the balance of fair use factors differently, and reverse.

### I

Los Angeles News Service (LANS) is an independent news organization that provides news stories, photographs, audiovisual works and other services to the news media. When rioting broke out in Los Angeles on April 29, 1992, in the aftermath of the Rodney King verdict, LANS's helicopter hovered above the intersection of Florence and Normandie where Reginald Denny was beaten. Markika Tur's camera captured the incident from overhead. It was broadcast "live" on KCOP, a LANS licensee, and by tape later that evening. Other stations broadcast the Videotape as well, before it was broadcast by KCAL. KCAL asked LANS for a license, which LANS refused, but KCAL obtained a copy of the tape from another station and broadcast it a number of times on April 30 and thereafter on its commercially sponsored news programs.

The district court held that the doctrine of fair use exempts KCAL from liability based on undisputed facts that the Denny Videotape is a unique and newsworthy videotape of significant public interest and concern; KCAL used portions of the tape in its newscasts for purposes of news reporting; and LANS failed to identify any sale or license or potential sale or license that it lost due to KCAL's conduct. Accordingly, it granted summary judgment in KCAL's favor. LANS moved for reconsideration based on evidence

that it had lost at least one sale as a result of KCAL's unlicensed use of the Denny tape and that KCAL had other footage of the beating available to it. The district court denied the motion, and LANS timely appealed.[1]

### II

" 'Fair use is a mixed question of law and fact.' If there are no genuine issues of material fact, or if, even after resolving all issues in favor of the opposing party, a reasonable trier of fact can reach only one conclusion, a court may conclude as a matter of law whether the challenged use qualifies as a fair use of the copyrighted work." *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1150 (9th Cir.1986) (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 559, 105 S.Ct. 2218, 2230, 85 L.Ed.2d 588 (1985); other citations omitted).

### III

LANS argues that the district court inappropriately resolved the fair use factors because KCAL's use was nontransformative, commercial, and improper; it interfered with LANS's ability to control the initial dissemination of the Denny tape; the use was substantial even though KCAL broadcast only 30 seconds of the four minute, 40 second Videotape because it was the heart of the work; and it had a serious effect on the potential market for LANS's copyrighted work because KCAL's unauthorized commercial broadcasts competed directly with LANS's authorized licensees.

KCAL, on the other hand, focuses on the factual nature of the Videotape and its use for news reporting purposes. It challenges LANS's view that its use was nontransformative, noting that both the Supreme Court and this circuit have recognized that news reporting is a productive use. *See Harper & Row*, 471 U.S. at 561, 105 S.Ct. at 2231; *Los Angeles News Service v. Tullo*, 973 F.2d 791, 797 (9th Cir.1992). KCAL also emphasizes that the Videotape had been published before

---

1. We do not reach LANS's appeal from denial of its motion to reconsider in light of our disposi- tion.

KCAL ever used it. Further, it points out, only a small portion of the total amount of LANS's tape was used, and even then, only enough for KCAL to carry out its news reporting function of reporting on the riots. Moreover, KCAL submits, its use of the Videotape did not diminish the potential sale of the work or interfere with its marketability because LANS entered into more than a dozen licenses for the Videotape after KCAL used it. Rather, its use for news reporting purposes enabled the public to understand what the rioters did to Denny, and thus did not replace any demand for the original work. Finally, KCAL maintains that the Videotape is unique because the Videotape itself is part of the news event. For this reason, First Amendment considerations reinforce the conclusion that KCAL's use was fair.

As KCAL undeniably used LANS's copyrighted work without permission, we turn to whether its use was fair. This requires us to balance the non-exclusive factors set out in 17 U.S.C. § 107.[2] *Harper & Row*, 471 U.S. at 549, 105 S.Ct. at 2224–25.

### A

*Purpose and character of use.* Even though the fact that KCAL was reporting news weighs heavily in its favor (§ 107 itself gives news reporting as an example), the fact that LANS and KCAL are both in the business of gathering and selling news cuts the other way. LANS does work that its licensees choose not to do for themselves, for example, operating its own helicopter with news crew aboard, and gets paid for licensing its coverage of news to the media. By the same token, KCAL is a for-profit company that is engaged in a commercial enterprise that also gathers, and then (indirectly) "sells" news. It, therefore, "stands to profit from exploitation of the copyrighted material with-

out paying the customary price." *Harper & Row*, 471 U.S. at 562, 105 S.Ct. at 2231. "[N]ewscasts are commercially supported by advertisers, who pass the cost of sponsorship on to those who purchase their products." Note, *Who Can Use Yesterday's News?: Video Monitoring and the Fair Use Doctrine*, 81 Geo.L.J. 2345, 2345 n. 2 (1993). *Accord Roy Export Co. v. Columbia Broadcasting System, Inc.*, 503 F.Supp. 1137, 1144 (S.D.N.Y. 1980), *aff'd*, 672 F.2d 1095 (2d Cir.1982). Thus, KCAL competes with other stations for advertising dollars, which are in turn dependent upon KCAL's viewership. The fact that KCAL used LANS's copyrighted footage free of charge, rather than paying LANS or someone else for the footage, or investing in its own helicopter and crew to obtain the footage itself, at least raises an inference that its articulated purpose of reporting the news was mixed with the actual purpose of doing so by using the best version—whether or not it meant riding LANS's (or some other station's) copyrighted coattails. While this did not serve to supplant the copyright holder's commercially valuable right of first publication as The Nation did in *Harper & Row* by scooping the hardcover and Time abstracts of President Ford's memoirs, we cannot say that KCAL's use of the Denny tape had neither the effect nor purpose of depriving LANS of its also valuable right of licensing its original videotape which creatively captured the Denny beating in a way that no one else did. *See, e.g., Tullo*, 973 F.2d at 796.

On the other hand, there is a forceful argument that the LANS tape of the Denny beating *itself* became a news item shortly after it was published because its view was so extraordinary. To the extent that KCAL ran the tape as a news story, this would weigh in its favor. However, this factor does

2. Section 107 provides in relevant part:

Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work ... for purposes such as ... news reporting, ... is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

not weigh nearly so heavily as it might otherwise since there is no evidence that KCAL used the tape in this way. It did not attribute the tape to LANS, and so far as the record discloses, aired it as if it were KCAL's own rather than, for example, indicating that the best tape of the beating had been made by a LANS helicopter crew. Instead, the tape was simply used as part of KCAL's coverage of the riots. Although KCAL apparently ran its own voice-over, it does not appear to have added anything new or transformative to what made the LANS work valuable—a clear, visual recording of the beating itself.

While the fact that KCAL had requested a license but had been refused one is not dispositive, see Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 585 n. 18, 114 S.Ct. 1164, 1174 n. 18, 127 L.Ed.2d 500 (1994), "the propriety of the defendant's conduct" is relevant to the character of the use at least to the extent that it may knowingly have exploited a purloined work for free that could have been obtained for a fee. Harper & Row, 471 U.S. at 562, 105 S.Ct. at 2231; accord Narell v. Freeman, 872 F.2d 907, 914 (9th Cir.1989). Unlike the circumstances in Campbell, nothing in this record suggests that KCAL requested a license "in a good faith effort to avoid this litigation." Campbell, 510 U.S. at 585 n. 18, 114 S.Ct. at 1174 n. 18. And unlike the use of the original in 2 Live Crew's parody of "Oh, Pretty Woman," KCAL obtained a copy of the tape from another station, directly copied the original, superimposed its logo on the LANS footage, and used it for the same purpose for which it would have been used had it been paid for.

**B**

Nature of the copyrighted work. The Denny beating tape is informational and factual and news; each characteristic strongly favors KCAL. Likewise the fact that the tape was published before its use by KCAL. Harper & Row, 471 U.S. at 564, 105 S.Ct. at 2232. Although the Videotape is not without creative aspect in that it is the result of Tur's skills with a camera, still this factor makes it a great deal easier to find fair use. Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 455 n. 40, 104 S.Ct. 774, 795 n. 40, 78 L.Ed.2d 574 (1984) (contrasting motion pictures with news broadcasts). Therefore, this factor weighs substantially in KCAL's favor. Tullo, 973 F.2d at 798.

**C**

Amount and substantiality of what was used. While a small amount of the entire Videotape was used, it was all that mattered. As we said of the defendant Audio Video Reporting Services in Los Angeles News Service v. Tullo, which provided a video "news clipping" service by monitoring television news programs, recording them on videotape and selling copies to interested individuals and businesses, "[a]lthough AVRS copied only a small part of the raw footage shot by LANS, it was the most valuable part of that footage. In preparing a newscast, a television station selects the most effective and illustrative shots from the raw footage available. Thus the news programs AVRS copied included what LANS's customers thought was the best of the LANS footage—its 'heart.'" Id. at 798. Here, as there, this factor weighs against KCAL, for "the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression." Harper & Row, 471 U.S. at 565, 105 S.Ct. at 2233.

**D**

Effect on the market. This case doesn't fit neatly into a traditional niche, because "news" isn't normally thought of as having a secondary market. "'Copying a news broadcast may have a stronger claim to fair use than copying a motion picture' because the potential market for copies of news broadcasts is not as great as that for copies of movies." Tullo, 973 F.2d at 798 n. 6 (quoting Sony, 464 U.S. at 455 n. 40, 104 S.Ct. at 795 n. 40). Also, LANS's tape had been licensed—and published—before KCAL's use, and was licensed after its use. To that extent, this factor weighs in favor of KCAL. At the same time, KCAL's stated purpose was to use the tape as "news" and it was a potential (and in the past was an actual) licensee or consumer of LANS's product;

there is evidence that, given what LANS and KCAL do, KCAL's use of LANS's works for free, without a license, would destroy LANS's original, and primary market. Indeed, *Sony* suggests that this kind of duplication for commercial use may give rise to a presumption or inference of harm. *Sony,* 464 U.S. at 451, 104 S.Ct. at 793. Just as we recognized in *Los Angeles News Service v. Tullo* that customers might choose to buy raw footage from LANS if they couldn't buy it from AVRS, *Tullo,* 973 F.2d at 799, KCAL was ready to buy from LANS if it could, but went elsewhere when it couldn't. Were this to happen more broadly, it no doubt would adversely affect LANS's creative incentives. *See Campbell,* 510 U.S. at 587–89, 114 S.Ct. at 1176 (courts must consider " 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market' for the original") (quoting Nimmer, § 13.05[A][4], p. 113–102.61); *Harper & Row,* 471 U.S. at 569, 105 S.Ct. at 2235. All told, this weighs against a finding of fair use.

In sum, KCAL's use of LANS's copyrighted tape was arguably in the public interest because it was a percipient recording of a newsworthy event. However, KCAL's use was commercial and came in the wake of LANS's refusal of a license. Although KCAL explains that it used the tape because it recorded news of considerable significance from the best perspective of any witness, there is no evidence that alternatives were not available (albeit from a less desirable vantage point). Also, while the tape had been licensed and published before KCAL's use, it is not obvious that there was no impact on the market for first publication rights as KCAL itself requested a license. There is no dispute that KCAL used the heart of the tape. Under these circumstances, we cannot say that fair use is the only reasonable conclusion a trier of fact could reach in this case. We therefore reverse and remand for further proceedings.

REVERSED AND REMANDED.