**LOS ANGELES NEWS SERVICE;**
**Robert Tur, Plaintiffs–**
**Appellants,**

v.

**CBS BROADCASTING, INC.; Court-**
**room Television Network, De-**
**fendants–Appellees.**

**Nos. 00–56470, 00–57000.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 2002.

Filed Sept. 16, 2002.

928

H. Jay Ford III, Tyre Kamins Katz & Granof, Los Angeles, CA, argued the cause for the appellants. Lindsey A. Duro, Los Angeles, CA, and William A. Bergen, Auburn, CA, were on the briefs.

Frederick F. Mumm, Davis Wright Tremaine LLP, Los Angeles, CA, argued the cause and filed a brief for the appellees.

Before: O'SCANNLAIN and SILVERMAN, Circuit Judges, and REED,* District Judge.

Opinion by Judge O'SCANNLAIN; Partial Concurrence and Partial Dissent by Judge SILVERMAN.

O'SCANNLAIN, Circuit Judge.

We must decide whether the owner of the copyrighted video "Beating of Reginald Denny" can establish that a satellite news service infringed its copyright, and whether a television network's incorporation of that video into promotional materials was a fair use.

---

* The Honorable Edward C. Reed, Jr., Senior United States District Judge for the District of Nevada, sitting by designation.

## I

In this age of television news, it is frequently the image accompanying the story that leaves an event seared into the viewership's collective memory. The riots that shook Los Angeles in April 1992 are book-ended by two such images: the footage of police officers beating motorist Rodney King, which led to the trial and verdict that sparked the rioting, and the footage of rioters beating truck driver Reginald Denny, which through television synecdoche has come to symbolize in a few moments the multiple days of violence that swept over the city. The latter image gives rise to this litigation, the latest installment in a series of suits by which the owners of the rights to that videotape have sought to ensure that renown translates into remuneration.

## A

Los Angeles News Service, Inc. (LANS), is an independent newsgathering organization that makes and licenses video and audio recordings of breaking news events. While filming the Los Angeles riots from LANS's helicopter, Marika Tur, who is LANS's co-owner, shot the footage from which this and other litigation arose. LANS's other co-owner, Marika Tur's pilot and husband Robert Tur, subsequently applied for and received copyrights for four separate segments of the video-tape recorded that night; the copyrighted works, which total about nine minutes' worth of footage, are known as "Beating of Reginald Denny," "Beating of Man in White Panel Truck," "Beating of Man in Brown Hatchback with Rescue," and "Japanese Man in Brown Bronco Attacked by Rioters." LANS retains ownership of those copyrights and continues to sell licenses for limited use and rebroadcast of the works.

Defendant CBS Broadcasting, Inc., is a component of Viacom Inc., which includes the former Westinghouse Electric Co. During the time period relevant to this litigation, the Westinghouse corporate family included an operating unit known as Group W Newsfeed, a video news service.[1] Using both satellite uplinks and conventional videotapes, Group W supplied its subscriber TV stations with both packaged news stories and raw footage of newsworthy events, which the stations could then utilize in their own news programming. On several occasions, Group W licensed footage from LANS to distribute to its Newsfeed subscribers.

LANS offered Group W a license to distribute its riot footage, which was declined. LANS asserts, however, that in investigating the unauthorized rebroadcast of its copyrighted works, it discovered that Group W had indeed distributed the four works over its Newsfeed service. LANS contends that multiple recipients of the Newsfeed distribution then made use of the copyrighted works.

Courtroom Television Networks ("Court TV") was one alleged recipient. Court TV used a few seconds of footage from "Beating of Reginald Denny," primarily the frames depicting Damien Williams throwing a brick at Denny's head, in on-air "teaser" spots promoting its coverage of the trial of Williams and his co-defendant Henry Watson. It also incorporated the brick-throwing footage into the introductory montage for its show "Prime Time Justice," which used a stylized orange clock design superimposed over a grainy, tinted, monochromatic video background. The

---

**1.** Westinghouse's subsidiary Group W Television, Inc., sold Newsfeed to another broadcasting company in 1992.

background changed as the "hands" of the clock revolved; LANS's copyrighted video was in the background for a couple of seconds, one 360° sweep of the clock. Court TV did not dispute that it had used the footage, but it asserted that it had obtained the video not from Newsfeed but from the courtroom video monitor during the Williams and Watson trial.

### B

LANS filed suit in federal district court against Westinghouse, Court TV, and a number of other defendants, alleging copyright infringement. After the conclusion of discovery, Westinghouse and Court TV moved for summary judgment. However, in February 1997, LANS agreed to a stipulated dismissal of those two parties from the action (in exchange for confidential consideration) in an attempt to negotiate a settlement. The stipulation tolled the statute of limitations for two years and guaranteed LANS the right to re-file its complaint against Westinghouse and Court TV during that time, upon thirty days' notice.

Settlement negotiations failed, and LANS re-filed its complaint in January 1999 after giving the requisite notice. Due to the intervening corporate reorganization, the renewed complaint named CBS Broadcasting Inc. ("CBS") in Westinghouse's stead. CBS and Court TV renewed their motions for summary judgment, asserting that any use of "Beating of Reginald Denny" was protected by the defense of fair use and that LANS had no evidence that either of them had infringed any of the other three copyrighted works. LANS in turn moved for partial summary judgment on the issue of liability.

### 1

In support of its motion for partial summary judgment against CBS, LANS prof-

fered several pieces of evidence. CBS objected to each as inadmissible, and it relied on these objections in its own motion for summary judgment; if the evidence of infringement was inadmissible, LANS would have failed to carry its burden of establishing infringement and CBS would be entitled to summary judgment. To understand the court's evidentiary rulings, a more detailed elaboration of LANS's proffered evidence is required.

### a

Robert Tur[2] submitted a declaration in which he asserted that in May 1997 (after the stipulated dismissal), he saw three of the copyrighted works broadcast on a local station, KPIX–TV. He stated that he had telephoned the station and spoken to a man identifying himself as an editor, who had told him that KPIX had obtained the riot footage it showed from Group W's Newsfeed. Tur further averred that in a subsequent call to KPIX, he spoke to an archivist and requested "a copy of the footage KPIX received from Group W's Newsfeed." The station, he said, proceeded to send him a videotape on which were recorded an identifying slate and copies of the three copyrighted works. The slate reads, "DAYFEED–Special Feed L.A. Riot Violence 05/03/92 Group W Newsfeed Copyright 1992."

CBS objected to admission of this portion of Tur's declaration and of the supporting videotapes and color stills, in part on the ground that the submission of such evidence violated the parties' 1997 stipulation. Paragraph 5 of that agreement reads in pertinent part:

> In the event that the First Amended Complaint is refiled by Plaintiffs against Westinghouse and Court TV, it is the

---

**2.** Hereinafter, "Tur" refers to Robert Tur ab-   sent a contrary indication.

parties' intention that they be restored to the same litigation positions they currently enjoy. Accordingly, the parties further agree that if the First Amended complaint is refiled against Westinghouse and Court TV, the parties will have no right to assert any new or additional claims or defenses, conduct discovery, or allege additional acts of infringement. The parties agree that any discovery obtained in the present action will be admissible in any refiled action to the same extent it would have been admissible in the present action.

CBS contended that the agreement precluded admission of the evidence LANS obtained from KPIX after the stipulated dismissal.

The district court concluded that the stipulation's statement of the parties' intent was controlling and that restoring "the same litigation positions" necessarily meant limiting the parties to the evidence that was available in February of 1997. The court accordingly sustained CBS's objection and ruled that Tur's declaration testimony about KPIX, the videotape he received from KPIX, and the color stills he made from that tape were all inadmissible.

### b

Tur's declaration also recounted another phone call, this one to Group W. Tur stated that he had spoken to "a lawyer and two other people from Westinghouse," who had expressly told him that Group W had distributed the four copyrighted works through its Newsfeed service. In a later filing, Tur offered excerpts of his previous deposition testimony in support of this assertion. There, Tur had stated that he had called Westinghouse and spoken to two different people, one of whom referred him to a Westinghouse attorney, and that the attorney had confirmed that each of the four copyrighted works had been in-

cluded in a newsfeed. However, Tur could remember none of the three employees' names or titles, and Tur had admitted in his deposition that he was not sure what part of the Westinghouse corporate structure he had contacted.

CBS objected that the statements were inadmissible hearsay. The district court agreed with LANS that the statements would not be hearsay, and thus would be admissible, if they were Westinghouse's own statements. However, the district court concluded that LANS had not adequately established a foundation for concluding that the statements were either authorized by Westinghouse, Fed.R.Evid. 801(d)(2)(C), or made by Westinghouse's agent "concerning a matter within the scope of the agency or employment" and "during the existence of the relationship," Fed.R.Evid. 801(d)(2)(D). It therefore sustained CBS's objection and ruled that the portions of Tur's declaration relating to his call to Group W were inadmissible.

### c

LANS also submitted a declaration by Robert Fox, a producer for MTV, and a letter from Merrill Brown, a former executive at Court TV. Fox stated that he had used a clip from "The Beating of Reginald Denny" in an MTV program; that he had obtained the clip from a beta tape in the MTV video library; and that that tape's box "identified Group W News Service as the source." Brown's letter stated that Court TV had "received from Group W Newsfeed six seconds of footage that appears to be" the Reginald Denny beating. CBS objected that Fox's description of the label was hearsay outright and that Brown's letter was hearsay at least as to CBS. The district court sustained these objections as well and ruled that the Fox and Brown statements were inadmissible.

### d

Finally, LANS submitted Westinghouse's response to an interrogatory propounded and answered in the previous litigation. LANS had submitted the interrogatory, "YOU used the VIDEOTAPE without the authorization of the copyright holder." In its response, Westinghouse objected to the request for admission of the interrogatory on three grounds, including that it was "vague and ambiguous, particularly with respect to the meaning intended by the term 'used' "; however, "[w]ithout waiving the foregoing objections," Westinghouse responded "Admitted."

The district court sustained the reserved objection and excluded the admission. It rejected LANS's contention that the term "use" is not vague because the Copyright Act defines it; the court concluded that no statutory provision defines the term and, indeed, that under some circumstances the public may "use" a copyrighted work without infringing the copyright.

Having excluded all of LANS's evidence probative of Group W's distribution of the copyrighted works, the district court denied LANS's motion for partial summary judgment as to CBS and granted summary judgment to CBS.

### 2

Court TV based its motion for summary judgment on the affirmative defense of fair use. Weighing the four non-exclusive factors that the Copyright Act prescribes, the district court concluded that all weighed in favor of a finding of fair use. It reasoned that Court TV's use was primarily (though not exclusively) for the noncommercial purpose of news reporting; that the incorporation of the footage into the "Prime Time Justice" montage had a transformative effect; that Court TV had rebroadcast only a small portion of the work; and that Court TV's use had not significantly affected the market for licenses to use the work, as Court TV was engaged not in breaking news coverage, but in trial reporting, in which LANS is not a competitor. The district court accordingly granted Court TV's motion for summary judgment as well and denied LANS's motion for partial summary judgment as to Court TV.

LANS filed this timely appeal.[3]

### II

In determining whether the district court erred in granting summary judgment to CBS, we must first decide whether it erred in excluding LANS's proffered evidence that Newsfeed distributed its copyrighted works. If some or all of the evidence is admissible, and if a reasonable jury could conclude from the admissible evidence that CBS infringed LANS's copyright, the grant of summary judgment would be improper.

### A

■ In excluding the videotape that Tur obtained from KPIX and the supporting language in Tur's declaration, the district court relied not on any of the substantive prohibitions that the stipulation made applicable to any renewed litigation, but on its provision that the parties would be "restored to the same litigation positions." In particular, it is clear that LANS's obtaining of the videotape from KPIX by the simple expedient of a telephone request did not violate the prohibition on the par-

---

**3.** LANS is the appellant in both No. 00–56470 and No. 00–57000; it filed two notices of appeal, one following the district court's order granting summary judgment, one following the entry of judgment pursuant to Fed. R.Civ.P. 58. We consolidated the two appeals.

ties' conducting renewed discovery. *See* Fed.R.Civ.P. 26(a)(5) (defining the methods by which discovery may be had); Fed. R.Civ.P. 34 (providing for discovery of tangible things in the possession of a party by means of requests for production, but providing for discovery of tangible things in the possession of a non-party by means of a subpoena). The question accordingly is whether the provision reinstating the parties' "litigation positions" independently prohibits the introduction of evidence obtained by means other than formal discovery.

■ Even if the "litigation positions" provision is not merely precatory, but rather imposes conditions on a re-filed action in addition to the five specific restrictions that follow it,[4] the examples (no new claims or defenses; no discovery; no additional acts of infringement; no reconsideration of prior evidentiary rulings; no bar to renewing the pending motion for summary judgment) certainly shed some light on what the general term means. A basic maxim of construction, *ejusdem generis*, directs courts to read specific examples to constrain the general language that precedes them. *E.g., Travelers Indem. Co. v. United States,* 543 F.2d 71, 76 (9th Cir. 1976).

The specific provisions apply both to the substantive nature of the action (locking in those claims and those acts of infringement already alleged, thus limiting the effect of paragraph 2's tolling provision to the causes of action that had already been asserted within the statute of limitation) and to its procedural posture (barring further discovery, except presumably by mutual consent, and guaranteeing that the dismissal would not bar renewal of the pending summary judgment motion). However, as the language of the general clause indicates, none of those provisions made any change to the posture of the case. This includes the bar on conducting discovery, for the court imposed discovery cutoff had passed several weeks before.

■ Thus, had the parties never agreed to the stipulation, LANS would have been unable to conduct further discovery, but it *would* have been able to search for evidence on its own through means not within the meaning of "discovery" in Rule 26(a)(5) of the Federal Rules of Civil Procedure. "The purpose of a discovery cutoff date is to protect the parties from a continuing burden of producing evidence and to assure them adequate time to prepare immediately before trial. A discovery cutoff date does not, however, affect admissibility of evidence obtained outside of the discovery process of the case in which the cutoff date is ordered." *Whittaker Corp. v. Execuair Corp.,* 736 F.2d 1341, 1347 (9th Cir.1984) (citation omitted); *cf. Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 34, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) (distinguishing "information obtained through use of the discovery process" from "the identical information ... gained through means independent of the court's processes," in analyzing a court's power to protect the discovery process by restricting disclosure of the former type of

---

4. The pertinent paragraph of the stipulation introduces its second sentence with the word "Accordingly," possibly giving some indication that the succeeding, more specific terms are the only components of the "litigation positions" that the agreement sought to regulate. However, the word "further" in the second sentence may indicate that the general term—the first sentence—is meant to have force independent of the specific terms that follow it, although the other provisions of the agreement use "further agree" and "agree" virtually interchangeably and without appearing to give the term "further" any structural significance.

**934**

information).[5] It is true that on this reading, the stipulation gave LANS two additional years' respite to search for evidence by nondiscovery means; on the other hand, the additional time could benefit or hinder either side.[6]

We conclude that the stipulation agreement did not bar LANS from introducing the videotape and supporting declaration. However, CBS made a number of other objections to these exhibits, on which the district court did not rule. We accordingly must examine whether any of CBS's evidentiary objections affords an alternative basis for the exclusion. *See, e.g., Summers v. Teichert & Son, Inc.,* 127 F.3d 1150, 1152 (9th Cir.1997) ("[A] grant of summary judgment may be affirmed if it is supported by any ground in the record, whether or not the district court relied upon that ground.").

## B

Most of the alternative bases for affirmance that CBS urges upon us rely on the hearsay rule, Fed.R.Evid. 802.

■ Tur's report of his conversation with the editor at KPIX is plainly hearsay. LANS seeks to introduce the editor's "oral . . . assertion" that Newsfeed provided the station with the riot footage "to prove the truth of the matter asserted," *i.e.,* that Newsfeed copied and distributed the copyrighted works. Fed.R.Evid. 801(a), (c). LANS's contention that the editor's statement was the admission of a party-opponent is unavailing, because LANS failed to lay an adequate foundation to support that contention. "The contents of the[hearsay] statements . . . are not alone sufficient to

establish" that the hearsay declarant was an agent of a party-opponent or that the declaration was within the scope of the agency. Fed.R.Evid. 801(d)(2). LANS submitted only Tur's assertion that KPIX was owned and operated by CBS; even if this relationship existed, however, it offered no evidence of the scope of the editor's agency relationship to KPIX or CBS beyond the editor's own hearsay declaration. LANS, as the proponent of the evidence, bore the burden of establishing a foundation from which to conclude that the statement was within a hearsay exclusion. *E.g., United States v. Chang,* 207 F.3d 1169, 1176 (9th Cir.2000). It simply failed to do so.

■ For the same reasons, Tur's account of his conversation with a Westinghouse lawyer is inadmissible hearsay. In his deposition, Tur admitted that he did not even remember what division of Westinghouse he had called, just that it had "something to do with television." Even accepting the assertion that the declarant was a lawyer—for which there was no evidence beyond the hearsay declaration itself—we cannot conclude that the district court abused its discretion by deciding that that fact, in the case of an employer the size of Westinghouse, does not adequately establish the scope of the declarant's authority.

■ Tur's report of his conversation with the archivist, by contrast, was not hearsay, at least not in relevant part. Even if Tur's declaration—his oral request for the videotape from KPIX's archives— can be characterized as an "assertion,"

---

5. The State of Washington's rules, which *Rhinehart* analyzed, were modeled on and virtually identical to the Federal Rules of Civil Procedure. *Rhinehart,* 467 U.S. at 29–30 & nn. 14–15, 104 S.Ct. 2199.

6. For example, the defendants' affirmative defense of fair use might have been bolstered by nondiscovery evidence pertaining to the market for licenses to show LANS's copyrighted works. 17 U.S.C. § 107(4) (2000).

LANS sought to introduce it not to establish the truth of what Tur said, but to show that Tur's request for the videotape led the station to send him the tape, with its identifying slate, that LANS also sought to introduce. Out-of-court declarations introduced to show the effect on the listener are not hearsay. *E.g., United States v. Payne,* 944 F.2d 1458, 1472 (9th Cir.1991). What the archivist *said* to Tur *would,* of course, be inadmissible hearsay, for the same reasons that what the editor said during the prior phone call was inadmissible hearsay. But Tur's declaration offered no account of what the archivist said (although it certainly implied that she said she was an archivist).

■ Which brings us to the videotape itself, and the identifying slate that appears on its opening frames. CBS urges us to conclude that the slate is hearsay or, if not, that the slate or the tape itself is not properly authenticated.

We think that the slate is most appropriately characterized as circumstantial evidence of origin, rather than as an "assertion" within the meaning of the hearsay rule. The slate is more akin to a postmark or a time stamp. We have held similar indicia of origin not to implicate the hearsay rule. In *United States v. Snow,* 517 F.2d 441 (9th Cir.1975), we held that a name tape attached to a briefcase, which bore the defendant's name, was circumstantial evidence of ownership—a mere "mechanical trace," to use Professor Wigmore's phrase—that did not implicate the hearsay rule. *Id.* at 443–44 (quoting 1 *Wigmore on Evidence* § 148 (3d ed.1940)). We followed *Snow* in *United States v. Alvarez,* 972 F.2d 1000 (9th Cir.1992) (per curiam), where we held that the inscription "Garnika, Spain" on a firearm was admissible as circumstantial evidence of the gun's having been manufactured outside the United States. *Id.* at 1004. On the same

theory, we believe that the slate was not inadmissible hearsay, and we will not affirm its exclusion on that rationale.

■ Nor do the rules governing authentication require that the slate be stricken. Indeed, the slate appears to fall directly within the text of the relevant Federal Rule, which provides that no extrinsic evidence is required to support the authentication of "labels purporting to be affixed in the course of business and indicating ownership, control, or *origin.*" Fed.R.Evid. 902(7) (emphasis added). Moreover, it is important to reiterate that the authentication requirement does not demand that the proponent of a piece of evidence conclusively demonstrate the genuineness of his article, but only that he make a showing "sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). And here, the Rules provide that the slate itself provides prima facie evidence of its own authenticity. CBS is free to rebut that showing on remand.

We therefore decline to affirm the exclusion of the video-tape contents and the supporting declaration testimony on the alternative grounds that CBS presses. Their ultimate reliability is, of course, a question of fact, on which we do not pass in the first instance.

C

LANS also appeals the exclusion as hearsay of two other out-of-court statements, Fox's declaration and Brown's letter.

■ We think that Fox's report of what he saw on the label in MTV's video library was inadmissible under the best evidence rule. Even assuming that the label's contents were not inadmissible

hearsay,[7] LANS was required to produce the original label (or a duplicate, *see* Fed. R.Evid. 1003) or at least explain why it could not do so. *See* Fed.R.Evid. 1002, 1004. Fox's declaration was submitted in the prior action, before the discovery cutoff, and LANS offers no basis for concluding that it could not have obtained the original label by ordinary third-party discovery. *See* Fed.R.Evid. 1004(2); Fed. R.Civ.P. 34(c), 45(a)(1)(C).

■ LANS also argues that Brown's letter was not inadmissible hearsay because CBS adopted it by manifesting a belief in its truth. *See* Fed.R.Evid. 801(d)(2)(B). It is true that CBS cited both the Brown letter and the Fox declaration[8] in an earlier summary judgment motion. However, although the form of its references varied somewhat,[9] the theory CBS espoused in that motion was significant: *even if* LANS's record evidence supporting distribution by Newsfeed were uncontroverted, CBS contended that it would still be entitled to summary judgment based on the affirmative defense of fair use, because LANS's own evidence showed that any infringing distributions occurred so long after the riots as not to undermine the market for LANS's works. In this posture, we do not think that the statements to which LANS points unambiguously manifest CBS's intent to adopt Brown's hearsay declaration as true, and we therefore conclude that the district court did not abuse its discretion by excluding it.

■ We also reject LANS's argument that both Brown's letter and Fox's declaration were admissible because LANS had introduced them in the prior action. The stipulation provided that "any discovery obtained in the [prior] action [would] be admissible in any refiled action to the same extent it would have been admissible in the [prior] action." Simply because the district judge had not yet ruled on admissibility in the prior action does not foreclose such a ruling upon refiling. The Brown letter and Fox declaration were not *per se* admissible under the stipulation.

### D

■ LANS's final evidentiary contention rests on the interrogatory that it propounded to Westinghouse in the prior action. We agree with the district court that the question was vague; as the district court correctly noted, "use" of a copyright-

---

7. One might argue that the label is not an "assertion" and thus is not hearsay under the *Alvarez* and *Snow* cases that we discuss above, or that the label constitutes a business record and therefore is admissible hearsay, *see* Fed.R.Evid. 803(6). We do not address these contentions in light of our conclusion that another rule bars indirect admission of the label's contents in this case.

8. In light of our conclusion that Fox's description of the label violates the best evidence rule, we need not consider whether CBS adopted it; demonstrating an adoptive admission would cure only the hearsay problem.

9. The moving papers included such statements as: "The uncontroverted evidence is that Newsfeed provided a three-second clip to MTV (which it did not use) and a six-second clip to Court TV."; "Newsfeed's actions ... did not harm plaintiffs ....."; "The portions of plaintiffs' works provided by Newsfeed to Court TV and MTV were taken from 'The Beating of Reginald Denny.' "; and "As reflected in the letter from Merrill Brown ... Newsfeed provided the clip to its subscribers on May 28, 1992." However, the papers also included more equivocal statements, such as: "The evidence reflects that Newsfeed apparently provided ....."; "Plaintiffs have no evidence that moving parties copied anything[except a short clip]. Specifically, discovery obtained from plaintiffs reflects that MTV obtained ....."; and "[D]iscovery reflects that Court TV 'received from ... Newsfeed 6 seconds of footage.' "

ed work (within the ordinary meaning of that term) is not necessarily infringement. *See* 17 U.S.C. § 106 (2000) (defining with particularity the exclusive rights of a copyright owner); 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.18[A] (2000). Private display, for example, might fall within the plain-language meaning of "use" without violating a copyright holder's exclusive rights.

LANS relies on our decision in *Marchand v. Mercy Med. Ctr.*, 22 F.3d 933 (9th Cir.1994), for the proposition that vagueness is a disfavored ground for objecting to an interrogatory. That is true so far as it goes, but we do not find that principle dispositive here. *Marchand* dealt with a defendant who responded to an interrogatory by *denying* it, objecting that it was vague. *Id.* at 938. The fact was later established at trial to be true, and the plaintiff sought reimbursement of expenses and attorney's fees. We ordered the reimbursement, holding that the vagueness objection was not a "good reason" for the defendant's failure to admit. *Id.; see* Fed.R.Civ.P. 37(c)(2)(D).[10] Here, the defendant made the admission, reserving its objection.[11] Moreover, the significance of its objection was that LANS would seek to use its response as evidence that it had "used" the works *in violation of LANS's copyright*, when, as the district court correctly concluded, the phrasing of the interrogatory was insufficiently specific for an affirmative answer to be given that specific construction. The district court thus did not abuse its discretion in sustaining the vagueness objection.

## E

Our analysis of the district court's evidentiary rulings has led us to conclude that the videotape, including the identifying slate, and associated portions of Tur's declaration are admissible evidence that should have been considered in weighing CBS's motion for summary judgment. We further conclude that a reasonable jury could find from the admissible evidence that CBS infringed LANS's copyright, *i.e.*, that LANS holds four valid copyrights, that the protected elements of those works were copied, and that it was Newsfeed that did so. *See, e.g., Christian v. Mattel, Inc.*, 286 F.3d 1118, 1128 (9th Cir.2002). We therefore must reverse the grant of summary judgment to CBS.

We cannot say, on the other hand, that LANS is entitled to partial summary judgment at this stage. CBS may well be able to raise a genuine issue of material fact regarding the reliability of the identifying slate on the tape obtained from KPIX, or even to rebut the prima facie showing of its reliability. Moreover, the district court did not rule on CBS's asserted defenses of fair use and release; we leave those issues open on remand as well. We therefore vacate the denial of LANS's motion for partial summary judgment and remand for further proceedings consistent with this opinion.

---

**10.** "If a party fails to admit the genuineness of any document or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of the matter, the requesting party may apply to the court for an order requiring the other party to pay the reasonable expenses incurred in making that proof.... The court shall make the order unless it finds that [one of three specific exceptions applies] or (D) there was other good reason for the failure to admit." Fed.R.Civ.P. 37(c)(2).

**11.** LANS argues for the first time on appeal that CBS waived its right to object by answering the interrogatory. We do not address this contention.

## III

We now turn to the district court's grant of summary judgment to Court TV. The pertinent facts are not in dispute;[12] we are left to decide only whether, on these facts, the fair use defense shields Court TV's rebroadcast of portions of the works. *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 993 (9th Cir.1998) (as amended).

Fair use requires individualized weighing of the equities of a given use of a given work. The Copyright Act gives some shape to the inquiry, listing four mandatory but nonexclusive factors:

In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107 (2000). "The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis .... Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copy-

right." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577–78, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).

## A

As the district court recognized, the most important component of the inquiry into the "purpose and character of the use" is the question whether the allegedly fair use was "transformative," *i.e.*, whether the second use "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* at 579, 114 S.Ct. 1164. "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.*

We have previously held that despite the newsworthiness of LANS's riot videos, their mere *rebroadcast* was not in itself transformative. *See, e.g., Reuters*, 149 F.3d at 993 ("Although [Reuters's] service does have a news reporting purpose, its use of the works was not very transformative. Reuters copies footage and transmits it to news reporting organizations; Reuters does not explain the footage, edit the content of the footage, or include editorial comment."); *L.A. News Serv. v. KCAL–TV Channel 9*, 108 F.3d 1119, 1122 (9th Cir.1997) ("Although KCAL apparently ran its own voice-over, it does not appear to have added anything new or transformative to what made the LANS work valuable—a clear, visual recording of the beating itself.").

For the most part, it does not appear that Court TV's use of the video clip was transformative. Merely plucking the most visually arresting excerpt from LANS's nine minutes of footage cannot be said to

---

12. Court TV asserts that it obtained the footage from the courtroom video monitor rather than from Newsfeed, but this contention is not pertinent to the fair use issue.

have added anything new. *See Folsom v. Marsh,* 9 F. Cas. 342, 345 (C.C.D.Mass. 1841) (No. 4,901) (Story, J.) ("There must be real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting the chief value of the original work."), *cited with approval in Campbell,* 510 U.S. at 578–79, 114 S.Ct. 1164. We concluded as much in *KCAL–TV,* where the defendant television station had provided its own voiceover to "Beating of Reginald Denny" and aired only selected portions, 108 F.3d at 1122, 1123, but we concluded that it "d[id] not appear to have added anything new or transformative." *Id.* at 1122. Here, simply extracting the clip of the Denny beating and juxtaposing it with a clip from Denny's testimony updates, but does not change, the purpose of depicting the attack on Denny—its newsworthiness, which had been ebbing as the event grew more removed but which had rebounded as the trial of Williams and Watson hit the headlines.

However, the inclusion of the clip in the video montage that introduced the Prime Time Justice program, following editing for dramatic effect, has a better claim to be within the scope of "transformation." The development of the montage at least plausibly incorporates the element of creativity beyond mere republication, and it serves some purpose beyond newsworthiness.

■■ One additional consideration affecting the analysis of this factor is that Court TV's use was largely commercial, *i.e.,* for the purpose of promoting its coverage rather than simply reporting, or reporting on, the news.[13] That Court TV used the work with a profit-making motive is not dispositive, but is an element of the analysis. 17 U.S.C. § 107(1); *Campbell,* 510 U.S. at 584–85, 114 S.Ct. 1164.

However, the more commercially exploitative use to which Court TV put the clip was also the more transformative, which in turn reduces the importance of the commercial purpose. Specifically, the opening montage of "Prime Time Justice" was calculated to promote the program and to retain the attention of any channel-surfer who happened to see it. Indeed, as the program's regular introduction, it was

---

**13.** Even straight reporting may, in some cases, be "commercial" for purposes of this factor. *See Harper & Row,* 471 U.S. at 562, 105 S.Ct. 2218 ("In arguing that the purpose of news reporting is not purely commercial, The Nation misses the point entirely. The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."); *KCAL–TV,* 108 F.3d at 1121; *see also* 4 Nimmer & Nimmer, *supra,* § 13.05[A][1][c], at 13–167 ("Even if the defendant's purpose in copying is news reporting—one of the characteristically fair purposes set forth in the preamble to Section 107—its profit motivation may negate the fairness of its use under this factor." (footnotes omitted)). The news business, after all, is not blind to the implications for its bottom line.

To be sure, as the Supreme Court has stated in the context of print journalism, "the news element—the information respecting current events contained in the literary production—is not the creation of the writer, but is a report of matters that ordinarily are *publici juris;* it is the history of the day." *Int'l News Serv. v. Associated Press,* 248 U.S. 215, 234, 39 S.Ct. 68, 63 L.Ed. 211 (1918). But "the original expression contained therein" remains copyrightable. *Harper & Row,* 471 U.S. at 557, 105 S.Ct. 2218. So "[t]he issue is not what constitutes 'news,' but whether a claim of newsreporting is a valid fair use defense to an infringement of *copyrightable expression,*" a category that encompasses the unique aspects of LANS's Denny video. *Id.* at 561, 105 S.Ct. 2218 (quoting William F. Patry, *The Fair Use Privilege in Copyright Law* 119 (1985) (internal quotation marks omitted)).

used to promote the program even when the program did not cover the Williams trial. At the same time, though, the opening montage was the more "transformative" of the allegedly infringing uses, which in turn reduced the importance of the commerciality of the use.

By contrast, the use of the clip in the coverage teasers was less transformative, meaning that a commercial purpose would take on greater weight—and this use was more plausibly associated with news reporting, a favored purpose under the statute, than was the Prime Time Justice montage. Indeed, the journalistic event was coverage of the Williams and Wilson trial, in which LANS's video featured prominently. And because the newsworthy event was the trial rather than the beating, Court TV was not in direct competition with LANS. *Cf. KCAL–TV*, 108 F.3d at 1121.

Although both the promotional use and the use in the montage have aspects that distinguish them from the pure infringement in *Reuters* or *KCAL–TV*, in neither instance can Court TV's commercial motive be completely discounted, as it would be for coverage of the courtroom when the copyrighted works were being introduced as evidence. On balance, the "purpose and character" factor weighs weakly in favor of fair use.

### B

■ We have analyzed the "nature of the copyrighted work" factor extensively in prior LANS litigation. "The Denny beating tape is informational and factual and news; each characteristic strongly favors [the user]. Likewise the fact that the tape was published before its use by [the alleged infringer]. Although the Videotape is not without creative aspect in that it is the result of [Marika] Tur's skills with a camera, still this factor makes it a great deal easier to find fair use." *KCAL–TV*, 108 F.3d at 1122; *accord Reuters*, 149 F.3d at 994; *see also Harper & Row*, 471 U.S. at 563, 105 S.Ct. 2218 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy."); *L.A. News Serv. v. Tullo*, 973 F.2d 791, 798 (9th Cir.1992). This factor clearly points toward fair use.

### C

■ It is undisputed that the "amount" of "Beating of Reginald Denny" actually used by Court TV was quite small, both in absolute terms—a few seconds at most—and "in relation to the copyrighted work as a whole." The question is whether the amount of footage Court TV left on the cutting-room floor weighs in favor of fair use or against it.

LANS presses heavily on our previous statements that although an alleged infringement may have used only a small portion of LANS's several minutes of footage, the portion used constituted the "heart"—the most valuable and pertinent portion—of the copyrighted material. *See KCAL–TV*, 108 F.3d at 1122 (quoting *Tullo*, 973 F.2d at 798) (internal quotation marks omitted); *see also* 4 Nimmer & Nimmer, *supra*, § 13.05[A][3], at 13–180 n. 209 (citing cases).

The same argument applies here to some degree. However, it is worth noting that the rebroadcast in this case was of only a few seconds' worth of footage. Although our opinion in *KCAL–TV* does not specify the amount of footage that the defendant station copied there, it appears that it was considerably more than the minor amount that Court TV used here. *See KCAL–TV*, 108 F.3d at 1120 (stating that there was "no dispute that KCAL used the heart of the tape"). Moreover, and more significantly, LANS asserted in the district court in its action against Reu-

ters "that the core or 'heart' of the tape, which is the actual attack on Reginald Denny, lasts for only about forty-five seconds." *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 942 F.Supp. 1265, 1273 (C.D.Cal.1996), *aff'd in part and rev'd in part on other grounds*, 149 F.3d 987, 994–95 (9th Cir.1998). LANS's current assertion that the single shot that Court TV employed was the "heart" of the tape seems less plausible in light of its earlier contention. *See also Nimmer & Nimmer*, supra, § 13.05[A][3], at 13–180 ("To avoid circular reasoning, the plaintiff manifestly should not be heard to argue that the defendant's copying of brief passages vouchsafes their qualitative significance." (footnote omitted)). *But cf. Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1155 (9th Cir.1986) ("A creative work does not deserve less copyright protection just because it is part of a composite work. Therefore, in this case, we view the Defendants as having copied an entire work.").

Case law interpreting this factor, though of course faithful to the statute's direction that we are to consider the substantiality of the portion used "in relation to the copyrighted work as a whole," has also noted that the purpose and character of the use are relevant in evaluating the denominator. *See, e.g., Kelly v. Arriba Soft Corp.*, 280 F.3d 934, 943 (9th Cir.2002) ("If the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her."). The frames that Court TV used for promotional purposes were closely tied to the subject matter it was promoting, *i.e.*, the Williams and Watson trial. And by choosing the most recognizable frames, it eliminated the need to take more; viewers who did not recognize the caption "*California v. Williams*" required only a short glimpse at the footage to be reminded of just who Williams was and why they might be interested in his trial.

To be sure, selectivity can cut both ways: Court TV urges that it took only what was necessary, while LANS accuses it of having deliberately lifted the choicest morsels. Our case law admonishes that poaching only the most significant part of a work makes the use no fairer than wholesale copying, but such reasoning is not without limit; at some point the selective extraction of significant footage can no longer be characterized as lifting the "heart." We do not gainsay the importance of the frames that Court TV used—if not the heart, they amount at least to a ventricle—but we think that this factor weighs less in LANS's favor than in the previous cases involving the Denny video. Indeed, weighing the brevity of the portion copied against its significance, this factor appears neutral.

### D

■ In evaluating the fourth factor, the effect of Court TV's unauthorized use on the potential market for licenses to rebroadcast the work, we "consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant … would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590, 114 S.Ct. 1164 (quoting 4 Nimmer & Nimmer, *supra*, § 13.05[A][4], at 13–102.61 (1993) (footnote omitted)).

■ The transformative use of the clip in the "Prime Time Justice" montage was quite unlikely to affect the relevant market. *See, e.g., Kelly*, 280 F.3d at 943 ("A transformative work is less likely to have an adverse impact on the market of the original than a work that merely supersedes the copyrighted work.").

The rebroadcast of the clip to promote trial coverage, which (as we note above)

was a less transformative use, is more problematic. LANS argues that at precisely that time interest in the riots, and in the footage that had come to symbolize them, had been renewed by the trial, and that Court TV therefore made its unauthorized use at a time when a genuine market existed for its Denny footage. However, the relevant question is whether the use of three-second clips of LANS's work—that is, the *uncompensated* use, not merely an additional use in an already saturated market—would substantially affect the market for licenses to show "Beating of Reginald Denny" in its entirety. It might indeed have had such an effect if the only reason, or even the most significant reason, to license the footage were to obtain the privilege of using the specific clip at issue here. However, LANS's position in the previous lawsuit was that a full forty-five seconds' worth of the video deserved to be called the "heart" of the work. Additionally, many—though not all [14]—of LANS's licensees used the clip in the course of news and current affairs programming that more likely than not required more than just a few seconds of video.

We are mindful of *Campbell's* admonishment that we must imagine the effect on the market if the allegedly fair use were universalized. However, Court TV operated in a significantly different market than did LANS. As we have noted, Court TV was not competing with LANS to show riot coverage, or even breaking news of the same general type; the courtroom setting is, after all, singularly unsuited to helicopter coverage. Moreover, this incident presented no apparent effort to evade licensing outright. *See KCAL–TV,* 108 F.3d at 1122–23. This is not a case of unrestrained piracy.

■ Although we are somewhat concerned with the state of the record regarding this factor in particular, neither party has urged us to hold that there is a factual dispute. As fair use is a mixed question of fact and law, so long as the record is "sufficient to evaluate each of the statutory factors," we may reweigh on appeal the inferences to be drawn from that record. *Harper & Row,* 471 U.S. at 560, 105 S.Ct. 2218. Having done so in the context of the market-effect factor, we conclude that it points in favor of fair use.

### E

We conclude that each factor, particularly the nature of the copyrighted work, weighs in favor of fair use except the substantiality of the use, which we treat as neutral. Accordingly, we agree with the district court that Court TV's use was protected, and we affirm the grant of summary judgment in its favor.

### IV

For the foregoing reasons, we REVERSE the grant of summary judgment to CBS, VACATE the denial of partial summary judgment to LANS on its claim against CBS, and REMAND for further proceedings on that claim. We AFFIRM the grant of summary judgment to Court TV. Each party shall bear its own costs on appeal. *See* Fed. R.App. P. 39(a)(4).

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, and REMANDED.

SILVERMAN, Circuit Judge, concurring in part and dissenting in part:

LANS sent CBS's predecessor, Westinghouse, a request to admit that: "YOU used the VIDEOTAPE without the authorization of the copyright holder." The

---

14. Notable non-journalistic users of the work include a Michael Jackson video and the movie *Rising Sun* (20th Century Fox 1993).

district court sustained Westinghouse's objection that the request was "vague and ambiguous, particularly with respect to the meaning intended by the term 'used'."

"Use" is a common word used in everyday English; and it is used, without definition, throughout the law. *See, e.g.,* 18 U.S.C. § 924(c) (penalizing one who *uses* a firearm during the commission of certain crimes). The definition of the word "use" is "[t]o put into service or apply for a purpose." American Heritage Dictionary of the English Language (3d ed.1992); *see also United States v. Rutherford,* 54 F.3d 370, 372–73 (7th Cir.1995) ("[i]n .ordinary English, the word 'use' implies intentional availment."). Its meaning is commonly understood in everyday parlance. In the context of this case, the only reasonable interpretation of the request was: "Admit that you availed yourself of the tape or employed it in some way without the authorization of the copyright holder." What else could it mean?

The district court ruled that the term "use" was vague because "use" of a copyrighted work is not necessarily infringement. But that is like saying that the word "take" is vague if asked: Did you take that newspaper without paying for it? Just as the taking of a newspaper is not necessarily theft (for example, if the newspaper is free), not every use of a copyrighted work constitutes infringement. It is entirely possible that Westinghouse might have used the tape without violating LANS's rights, or in a way that constituted a fair use under Section 107 of the Copyright Act. The request to admit simply asked Westinghouse to admit that it had used the videotape. Westinghouse remained free to explain at trial how it used the tape and why that use was legally permissible.

LANS propounded twenty-one requests for admissions. Westinghouse objected to every single one of them. Nineteen of the twenty-one requests were objected to as "vague and ambiguous." We should not encourage litigants to use disingenuous semantic quibbles to evade disclosure. I respectfully dissent from Part II(D) of Judge O'Scannlain's otherwise persuasive opinion, the balance of which I am pleased to join.